HERSHEY FOODS CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9121–80T.    Filed February 18, 1981.

---

*Jerome B. Libin* and *Leonard B. Terr*, for the petitioner.
*L. Michael Wachtel*, for the respondent.

OPINION

FAY, *Judge*: Respondent determined petitioner is not entitled to a favorable ruling under section 367[1] unless petitioner agrees to include certain amounts in income. Having exhausted its administrative remedies as required by section 7477(b)(2), petitioner has timely invoked the jurisdiction of this Court for a declaratory judgment pursuant to section 7477(a). The issue is whether respondent's determination is reasonable.[2]

This case was submitted for decision on the stipulated administrative record under Rule 122, Tax Court Rules of Practice and Procedure, and oral arguments were heard. The evidentiary facts and representations contained in the administrative record are assumed to be true for purposes of this proceeding.[3]

Petitioner, Hershey Foods Corp. (Hershey), is a Delaware corporation engaged in the manufacture, sale, and distribution of food and food-related items, principally chocolate and confections. At the time its petition in this case was filed, Hershey maintained its principal office in Hershey, Pa.

From 1962 through June 30, 1970, Hershey conducted manufacturing and sales operations in Canada through a wholly owned subsidiary. Since June 30, 1970, Canadian operations have been conducted as a branch of Hershey. This branch has been unprofitable, producing losses in every year but 1976. Those losses and the 1976 profit have been included in Hershey's consolidated tax returns as follows:

1970 .................................................($924,740)
1971 ................................................. (1,559,807)
1972 ................................................. (973,302)

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended.

[2]See sec. 7477(a)(2)(A); *Dittler Bros., Inc. v. Commissioner*, 72 T.C. 896 (1979), appeal filed (5th Cir., Feb. 11, 1980).

[3]*Dittler Bros, Inc. v. Commissioner*, *supra* note 2; Rule 217(b)(1), Tax Court Rules of Practice and Procedure.

| | | |
|---|---|---|
| 1973 | ................................................... | ($937,269) |
| 1974 | ................................................... | (315,146) |
| 1975 | ................................................... | (111,349) |
| 1976 | ................................................... | 86,611 |
| 1977 | ................................................... | (95,163) |
| 1978 | ................................................... | (668,000) (estimated) |

On November 30, 1977, Hershey acquired all the stock of Y & S Candies, Inc. (Y & S), in a stock for stock transaction. Y & S is a New York corporation engaged in the manufacture and sale of licorice, candies, and confections. Its principal office is located in Westfield, N.J.

Since 1908, Y & S has manufactured and sold its products in Canada through a branch which has been profitable. These profits were included in Y & S's tax returns through November 30, 1977. Since December 1, 1977, the Y & S Canadian branch profits and losses have been included in Hershey's consolidated returns as follows:

> December 1977 .................... [4] ($268,888)
> 1978 ...................................... 582,000 (estimated)

On October 13, 1978, Hershey requested a ruling that a proposed transaction involving the consolidation of the Hershey and Y & S Canadian branches does not have as one of its principal purposes the avoidance of Federal income taxes within the meaning of section 367.

The transaction as originally proposed was to occur as follows: Hershey and Y & S would form a new Canadian corporation, transfer the assets of their respective Canadian branches to the new corporation, and receive all the new corporation's stock.

On December 19, 1978, Hershey amended its ruling request. The amendment resulted from facts affecting a subsidiary of Y & S. In January 1978, Y & S organized a wholly owned Canadian corporation, Fred Thompson Sales (1978), Ltd. (New Thompson). New Thompson purchased certain assets of Fred Thompson

---

[4] Even though a loss of $268,888 is shown for December 1977, the Y & S Canadian branch was profitable in 1977. Profits for January through November of that year (before Hershey acquired Y & S) were $547,432. Both Hershey and Y & S are accrual method, calendar year taxpayers.

Sales, Ltd. (Old Thompson), a Canadian corporation which was a distributor of Y & S's products in Canada.[5] Y & S had to get the approval of the Canadian Foreign Investment Review Agency (FIRA) for the acquisition. To get such approval, Y & S agreed not to reduce the number of Old Thompson employees, not to dispose of any of Old Thompson's assets other than in the ordinary course of business, and not to discontinue any of Old Thompson's principal goods or services or otherwise alter its then current operations. In addition, the absorption of Old Thompson's business by the Y & S Canadian branch was prohibited.

However, shortly after the purchase, Old Thompson's former owner, whose contacts were vital to the business' success, died. Subsequently, the only major account of New Thompson other than Y & S terminated its contract with New Thompson. After negotiations, FIRA agreed to release Y & S from its obligations arising from New Thompson's acquisition of Old Thompson assets if Hershey and Y & S would transfer their respective Canadian branches into New Thompson. Thus, the amended ruling request substituted New Thompson for the earlier proposed newly formed Canadian corporation. New Thompson's name will be changed to Hershey Canada, Ltd. (HC), and new stock will be issued.

The business transferred will be the Hershey and Y & S Canadian manufacturing and sales operations. The assets transferred will consist of cash, commercial paper, certificates of deposit, raw materials, work in process, equipment, land, buildings, prepaid expenses, and goodwill, if any. Hershey and Y & S will retain their patents, patent applications, trademarks, trade names, licensing agreements, know-how, and similar intangibles. HC will use some of those intangibles under various arm's-length agreements.

In conjunction with the ruling request, Hershey agreed to include in gross income in the taxable year of transfer an amount appropriate to reflect any realization of income with respect to transferred work in process and raw materials. Hershey and Y & S employ the LIFO method of inventory for certain raw materials and raw material content of work-in-

---

[5]New Thompson also purchased some assets of two other Canadian corporations. Those purchases are not material in this case.

process. Any inventories transferred to HC will be transferred at their latest cost and recorded at these costs plus any income recognized by Hershey and Y & S on transfer. Finished inventory will be sold by HC as an agent for Hershey and Y & S for a 5 percent of gross sales proceeds commission.

Hershey and Y & S will transfer the Canadian branches' accounts receivable net of their respective bad debt reserves. Those accounts receivable have been or will be included in income by Hershey and Y & S. Hershey agreed to include in gross income in the year of transfer an amount necessary to reflect any gain realized on the transfer of accounts receivable, cash, commercial paper, and certificates of deposit because of differentials in currency exchange rates.[6]

HC will assume certain liabilities of Hershey and Y & S but not in amounts greater than the aggregate adjusted basis or the aggregate fair market value of the assets transferred. Thus, HC will be solvent. All liabilities assumed by HC will have been incurred by Hershey and Y & S in the ordinary course of business and will be associated with the assets transferred. None of the liabilities assumed will reflect intracompany accounts of Hershey and Y & S. No loans to HC from Hershey or from Y & S are planned.

Neither Hershey nor Y & S intend to sell or to otherwise dispose of the HC stock received or to liquidate HC. Furthermore, Y & S does not intend to distribute its HC stock to Hershey, and Hershey does not plan to liquidate Y & S. HC will not sell, dispose of, license, or lease the transferred assets. Rather it will retain and use those assets in an active trade or business for the foreseeable future. HC will have a need for a substantial investment in fixed assets in its business.

Consolidating the branches into a Canadian subsidiary will facilitate Canadian borrowing so Hershey can discontinue its practice of advancing U.S. dollars to its branches, and thus minimize the risks of exchange losses. Additionally, Canadian taxes will be saved since Hershey branch losses, if any, will offset Y & S branch profits. Thirdly, a combined operation will allow more efficient administration and prevent the unnecessary duplication of many services. Finally, the FIRA supervision of

---

[6]See Rev. Rul. 81–4, 1981–1 I.R.B. 12.

New Thompson's operations is another reason for incorporation of the Canadian branches via New Thompson.

Respondent issued a final determination letter on March 11, 1980, holding that the proposed transaction has as one of its principal purposes the avoidance of Federal income tax, unless Hershey agrees to include in income in the taxable year of transfer an amount (as ordinary foreign source income) equal to the Hershey Canadian branch's net cumulative loss from its inception in 1970 until the date of transfer, reduced by the Y & S Canadian branch's net cumulative profit from December 1, 1977 (when Hershey acquired Y & S), until the date of transfer. That amount would be about $5 million.

The issue is whether respondent's determination is reasonable. Sec. 7477(a)(2); *Dittler Bros., Inc. v. Commissioner*, 72 T.C. 896 (1979), appeal filed (5th Cir., Feb. 11, 1980).[7]

In making our decision we begin with section 367 which provides, in part:

(a) TRANSFERS OF PROPERTY FROM THE UNITED STATES.—

(1) GENERAL RULE.—If, in connection with any exchange described in section 332, 351, 354, 355, 356, or 361, there is a transfer of property (other than stock or securities of a foreign corporation which is a party to the exchange or a party to the reorganization) by a United States person to a foreign corporation, for purposes of determining the extent to which gain shall be recognized on such transfer, a foreign corporation shall not be considered to be a corporation unless, pursuant to a request filed not later than the close of the 183d day after the beginning of such transfer (and filed in such form and manner as may be prescribed by regulations by the Secretary), it is established to the satisfaction of the Secretary that such exchange is not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes.

Thus, when property is being transferred by a domestic corporation to a foreign corporation, the foreign corporation will not be considered a corporation unless a ruling is obtained which determines that avoidance of Federal income taxes is not one of the principal purposes of the plan pursuant to which the transfer is made. Without such a ruling, section 351 nonrecognition cannot apply since section 351 requires a corporate transferee.

Accordingly, the real question before us is simply whether

---

[7] In *Dittler Bros., Inc. v. Commissioner, supra* note 2, we adopted the substantial evidence rule as the appropriate standard of review. Thus, petitioner, who bears the burden of proof, must show that respondent's conclusion is not supported by substantial evidence. See generally *Consolo v. Federal Maritime Commission,* 383 U.S. 607, 620 (1966).

respondent could reasonably determine that one of petitioner's principal purposes in structuring the proposed transaction was the avoidance of Federal income taxes. As such, it might appear that we are unavoidably faced with the job of identifying, analyzing, and ranking motives as we did in *Dittler Bros., Inc. v. Commissioner, supra.* However, such an analysis would necessarily assume that there exists in the proposed transaction some tax-avoidance potential which could motivate petitioner. Therefore, we shall first examine the proposed transaction to see if any tax-avoidance potential exists. If it does not, then obviously tax avoidance cannot be a principal purpose behind the proposed transaction, and respondent's determination is baseless.

Avoidance of Federal income taxes is not defined by section 367 or by any other section using the phrase. See, e.g., secs. 269 and 1502. To give taxpayers some guidance in this area, respondent issued Rev. Proc. 68–23, 1968–1 C.B. 821, which sets forth transactions which will usually receive favorable consideration under section 367. In the case of a foreign incorporation under section 351, Rev. Proc. 68–23, *supra*, provides that, if the foreign corporate transferee will devote the transferred property to the active conduct of a trade or business and either will need a substantial investment in fixed assets in such business or will be engaged in the purchase and sale abroad of manufactured goods, a favorable ruling will ordinarily be issued. Sec. 3.01(1), Rev. Proc. 68–23, *supra*. HC, the Canadian corporate transferee in this case, clearly meets the requirements necessary for Hershey to receive a favorable ruling under that provision.[8] However, respondent contends this is not the usual situation and points to section 2.02, Rev. Proc. 68–23, *supra*, which provides, in part:

In reviewing each request for ruling to determine whether a favorable section 367 ruling should be issued under the guidelines, the Service reserves the right to issue an adverse ruling if, based on all the facts and circumstances of a case, it is determined that the taxpayer has not established that tax avoidance is not one of the principal purposes of the transaction. Similarly, a taxpayer shall be free to establish that based on all the facts and circumstances of the taxpayer's

---

[8]Sec. 3.02(1)(a) and (b), Rev. Proc. 68–23, 1968–1 C.B. 821, lists types of property which cannot be transferred to the controlled foreign corporation without jeopardizing a favorable ruling under sec. 367. Hershey and Y & S will not transfer any of those types of property except in instances in which they have already agreed to recognize income. See sec. 3.02(1)(d), Rev. Proc. 68–23, *supra*.

case a favorable ruling under section 367 of the Code should be issued, notwithstanding a contrary statement or implication contained in the guidelines. * * *

Thus, each case is controlled by its own facts and circumstances which may dictate a result different from the ordinary one. See *Dittler Bros., Inc. v. Commissioner, supra.*

The fact which troubles respondent in this case is that Hershey's Canadian branch, which will be transferred to HC, has suffered a series of losses in the past which reduced Hershey's worldwide income subject to Federal income tax. He reasons that transferring the historically unprofitable branch to a foreign corporation results in a presumption of tax avoidance since Hershey's future Canadian income will not be subject to Federal income tax. Respondent perceives a mismatching of loss and income and contends Hershey's income will not be reflected clearly as a result. That argument parallels Rev. Rul. 78–201, 1978–1 C.B. 91, which held that foreign incorporation of a branch operation when the branch could be expected to turn from a loss operation to a profit operation raises a presumption of tax avoidance.

Petitioner maintains that Rev. Rul. 78–201 is unsupportable, and that, even if correct, it does not apply in this case. Petitioner argues that no tax avoidance potential exists because Hershey's income has been and will be clearly reflected and because section 904(f) preemptively covers foreign loss recaptures in connection with foreign incorporations. We agree with petitioner for the reasons below.

We are admittedly puzzled by respondent's reliance on any clear reflection of income doctrine in this case. If his position were correct, we would be forced to view the Hershey Canadian branch's entire history as one event in determining whether income was clearly reflected. But that is not how the clear reflection of income doctrine is applied.

Federal income taxes are computed on an annual basis, not on a transactional basis. See sec. 441; *Burnet v. Sanford & Brooks Co.*, 282 U.S. 359 (1931); *United States v. Lewis*, 340 U.S. 590 (1951).[9] Each year stands on its own. A transactional approach

---

[9]The specific results in *Burnet v. Sanford & Brooks Co.*, 282 U.S. 359 (1931), and in *United States v. Lewis*, 340 U.S. 590 (1951), have been changed by secs. 172 and 1341, respectively. Nevertheless, their basic holding of nontransactional taxation remains sound.

under which we would wait to see the end result of an entire business venture before determining the proper tax consequences might be thought by some to be more equitable, but that is not the approach used in our system of income taxation. Thus, it is within the framework of annual taxation that the clear reflection of income doctrine operates.

Accordingly, what that doctrine requires is that a taxpayer's income be clearly reflected *each* year, not that a taxpayer's lifetime income or even his income in relation to a specific ongoing transaction be reflected clearly when viewed as a whole. There is no evidence or any contention by respondent that Hershey's income has not been clearly reflected in each of the years it suffered losses from the operation of the Canadian branch, and we do not see how foreign incorporation of Hershey's Canadian branch causes a failure to reflect income clearly.

Only if the Canadian branch becomes profitable after foreign incorporation and its entire historical existence is then viewed as one occurrence for tax purposes under a transactional approach would income fail to be reflected clearly. But, as noted above, annual taxation not transactional taxation is the American rule. If the branch were not incorporated and eventually produced income, that income would not be affected by the earlier losses. The only result of foreign incorporation is that income in future years will not be subject to Federal income tax. Essentially the same result would obtain if Hershey ceased to operate its Canadian branch, or if the branch had been profitable in the past.

In essence, respondent is espousing a tax benefit theory of taxation. There are two basic ways in which deductions taken in one year are included as income in another year—by application of a statutory recapture section (see, e.g., secs. 1245, 1250, 904(f)(3), and 617(a)(1)) or by application of the tax benefit rule—neither of which applies in this case.

Under the tax benefit rule, an amount properly deducted from gross income in determining one year's tax liability is includable in gross income when it is recovered in a subsequent year. *Davis v. Commissioner*, 74 T.C. 881 (1980). *Estate of Munter v. Commissioner*, 63 T.C. 663 (1975). The keys to tax benefit income are a prior benefit and "recovery of *property* that was once the subject of an income tax deduction." See *Alice Phelan Sullivan*

*Corp. v. United States*, 180 Ct. Cl. 659, 663, 381 F.2d 399, 401 (1967). (Emphasis added.) There has been no recovery by petitioner, and none is envisaged. See generally *Nash v. United States*, 398 U.S. 1 (1970). Therefore, the tax benefit rule does not apply in this case.

Nor can we find any other basis for respondent's determination of a tax-avoidance purpose. His position in this case represents an unreasonable use of the power conferred upon him by section 367. The United States taxes U.S. entities operating abroad but cannot and does not tax foreign entities on their foreign operations. Thus, every foreign incorporation of a U.S. business operating abroad takes the future profits involved outside of U.S. tax jurisdiction. We fail to perceive any crucial difference between a domestic corporation's foreign incorporation of a foreign loss branch and its foreign incorporation of a foreign profit branch. In both cases, only future, currently unearned, operating income is being removed from the clutches of Federal income taxation.

Moreover, we note that respondent's position in this case represents an extension of section 367's historical application. By 1976 "the statutory standard for determining that a transaction did not have as one of its principal purposes tax avoidance had evolved through administrative interpretation into a requirement generally that tax-free treatment would be permitted only if * * * the U.S. tax on the potential earnings from liquid or passive investment assets (in the case of transfers of property outside the United States) was paid or was preserved for future payment." Joint Committee on Taxation, 94th Cong., 2d Sess., General Explanation of the Tax Reform Act of 1976, at 257, 1976–3 C.B. (Vol. 2) 1, 269. Thus, in a section 351 setting, section 367 operated with respect to the *type* of assets being transferred, e.g., inventory, know-how, or stock, that might carry passive income which could just as easily be earned or realized in the United States or income which had essentially already been earned. In contrast, Rev. Rul. 78–201, *supra*, looks to currently unearned, future operating (not passive) income as the income upon which tax is being avoided.

We are fortified in our conclusion that no tax-avoidance potential exists in this case by the fact that Congress, in 1976, dealt comprehensively with the tax treatment of foreign losses. Basically, Congress took three major steps—(1) repeal of the per

country method of calculating available foreign tax credits; (2) recharacterization of certain foreign source income as U.S. source income to account for foreign losses in excess of foreign income; and (3) enactment of section 904(f)(3) which requires the recapture of excess foreign losses upon disposition of foreign branch assets. See generally Joint Committee on Taxation, 94th Cong., 2d Sess., General Explanation of the Tax Reform Act of 1976, at 236, 1976–3 C.B. (Vol. 2) 1, 248. As we will explain below, the net effect of those congressional actions combined with approval of respondent's argument in this case would result in double counting of Hershey's Canadian branch losses against Hershey.

Before the 1976 congressional action, available foreign tax credits could be claimed under either of two methods—the per country method or the overall method. In the case of a taxpayer suffering both foreign losses and foreign profits, the per country method could produce a lower Federal income tax liability since a loss in one country would not reduce the income from another country and concomitantly would not reduce the foreign tax credits available with respect to the foreign country operation producing income. See S. Rept. 94–938, p. 236, 1976–3 C.B. (Vol. 3) 248, 274. On the other hand, use of the overall method requires netting of all foreign losses and income regardless of the country in which they originate. Thus, a loss in one country will reduce the income in another country resulting in less foreign tax credits being available with respect to the foreign operations producing income. See S. Rept. 94–938, *supra*. By repealing the per country method, Congress ensured that all foreign losses will be matched against some foreign income in the year the losses are deducted unless losses exceeded income.

If foreign losses exceed foreign income, no foreign tax credits are available and excess losses serve to reduce U.S. source income. In that case, Congress felt that additional measures were necessary to ensure that U.S. source income bore its full share of Federal income tax. As stated in S. Rept. 94–938, *supra*:

where a taxpayer on the overall limitation reduces U.S. tax on domestic income by means of a loss from foreign sources, the committee believes that this tax benefit should be subject to recapture by the United States when foreign source income is subsequently derived. * * *

Accordingly, Congress enacted section 904(f)(1) which provides in essence that, when any excess foreign loss reduces U.S. source

income otherwise subject to tax, future foreign source income equal in amount to the excess loss will be treated as U.S. source income. That will reduce the amount of foreign tax credits available since the amount of foreign source income will be reduced. Thus, when the year(s) of excess loss and the year(s) of recharacterization are viewed together, U.S. source income will bear its full tax share.

Congress also addressed itself to the possibility that foreign branch assets might be disposed of before full excess foreign loss recapture via recharacterization of foreign source income could be accomplished. Section 904(f)(3) accelerates the recapture process upon such disposition by requiring recognition at the time of disposition of an amount of income equal to the lesser of the gain realized or the amount of any previously unrecaptured excess foreign loss.

The combined effect of the three above-stated steps is to ensure, in the long run, that foreign losses only reduce foreign income—any foreign loss matched against U.S. source income either will cause a recharacterization of later foreign source income as U.S. income or will itself be recognized upon a disposition of foreign branch assets. Thus, the objective of Congress, that U.S. income bear its Federal income tax share, is met. See generally *Theo. H. Davies & Co. v. Commissioner*, 75 T.C. 443 (1980).

Respondent maintains that even though section 904(f)(3) requires recapture of excess foreign losses upon foreign incorporation of a foreign branch, it does not preclude foreign loss recapture as a toll charge under section 367. In the case of a taxpayer who would have the same losses recaptured under both section 904(f)(3) and section 367, the result would be absurd. With that statement, respondent agrees. See Rev. Rul. 80–246, 1980–37 I.R.B. 8. Nevertheless, respondent contends that, when section 904(f)(3) does not apply because no excess loss which has reduced U.S. source income is present,[10] section 367 may be used to recapture past foreign losses. We disagree.

Since only the overall method of calculating available foreign

---

[10] We do not have before us the facts necessary to determine if there will be any sec. 904(f)(3) recapture income when the proposed transaction is consummated, although the parties seem to assume that there will be none. In the event there is any such income and Hershey or Y & S fails to recognize it, a deficiency could be asserted since sec. 904(f)(3) overrides sec. 351 nonrecognition. See sec. 904(f)(3)(A)(i).

tax credits is permitted, foreign losses must first be matched against foreign income thereby reducing foreign tax credits. Any foreign loss used to reduce United States source income will be recaptured. If we were to sustain respondent's position we would be counting Hershey's Canadian branch losses against it twice—first, to reduce other foreign income and thus reduce foreign tax credits and, second, as additional foreign source income. In effect, we would undermine the whole rationale behind the foreign tax credit system—the prevention of double taxation. See H. Rept. 94–658, pp. 222–223, 1976–3 C.B. (Vol. 2) 891, 914–915.

While we are generally hesitant to hold that one Code section precludes application of another Code section to the same situation, we find such result warranted in this case. See *Abegg v. Commissioner*, 429 F.2d 1209 (2d Cir. 1970), affg. 50 T.C. 145 (1968), cert. denied 400 U.S. 1008 (1971). Congress carefully studied the tax consequences of foreign losses and enacted comprehensive legislation to prevent any tax benefits previously allowed which Congress felt were unwarranted. From that, we infer that Congress never intended section 367 to be used to recapture past losses when a branch is incorporated in a foreign country. In fact, in discussing section 936 which concerns tax credits with respect to Puerto Rico and possessions, the committee report stated:

Unlike the act of incorporating a branch in a foreign jurisdiction, the making of a section 931 election does by itself cause a recapture of an earlier loss. H. Rept. No. 95–658, *supra*, at 256 n. 42, 1976–3 C.B. (Vol. 2) 891 at 948. S. Rept. No. 94–938, *supra*, at 279 n. 37, 1976–3 C.B. (Vol. 3) 248 at 317.

For the above-stated reasons we find respondent's determination, that the proposed transaction has as one of its principal purposes the avoidance of Federal income taxes unless Hershey agrees to recognize certain prior losses as income, unreasonable.

Having determined that respondent's determination is unreasonable we must address the issue set forth in section 7477(a)(1)(A)(ii). Sec. 7477(a)(2)(A). That issue is which, if any, terms and conditions are necessary to determine that the proposed transaction will not have as one of its principal purposes the avoidance of Federal income taxes. Since we have found that no potential for tax avoidance exists with respect to the Hershey Canadian branch losses, we conclude that no terms

and conditions are necessary apart from those already agreed to by Hershey as part of its ruling request.

Accordingly, we hold that respondent's determination is unreasonable, and the proposed transaction will be an exchange described in section 351.

*An appropriate decision will be entered.*