KAISER ALUMINUM & CHEMICAL CORPORATION AND KAISER ALUMINA AUSTRALIA CORPORATION, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3162–78T.     Filed February 18, 1981.

*M. Bernard Aidinoff, Kendyl K. Monroe,* and *Mark F. Dalton,* for the petitioners.

*Bobby D. Burns,* for the respondent.

OPINION

Wilbur, *Judge*: Respondent determined that petitioners' transfer of property to Comalco, an Australian corporation, is in pursuance of a plan having as one of its principal purposes the avoidance of income tax, within the meaning of section 367,[1] and that the gain from the transfer must be considered as gross income. Petitioners challenge respondent's determination and have invoked the jurisdiction of this Court for a declaratory judgment pursuant to section 7477. The issue presented for our decision is whether respondent's determination was reasonable.

### Jurisdiction

The statutory prerequisites for jurisdiction have been satisfied: petitioners have exhausted their administrative remedies (sec. 7477(b)(2)); the petition was filed by a petitioner who is a transferor or transferee of stock, securities, or other property transferred in an exchange described in section 367(a)(1) (sec. 7477(b)(1)); the transaction herein "began" before the filing of the petition (sec. 7477(b)(3)); and petitioners mailed their petition before the 91st day after respondent mailed notice of his determination in this matter (sec. 7477(b)(4)).

The case was submitted for decision on the stipulated administrative record under Rule 122, Tax Court Rules of Practice and Procedure. The administrative record is incorporated herein by this reference. Any evidentiary facts or representations contained therein are assumed to be true for purposes of this proceeding. The following facts are disclosed in the administrative record.

### The Participants

Petitioner Kaiser Aluminum & Chemical Corp. (hereafter Kaiser) is a Delaware corporation with its principal office in Oakland, Calif. Kaiser, a publicly held corporation, is a fully integrated aluminum producer with substantial interests, directly and through affiliates, in various aspects of the aluminum business in the United States, Australia, Jamaica, Europe, Africa, Asia, and Canada. Petitioner Kaiser Alumina Australia Corp. (hereafter KAAC) is also a Delaware corporation with its

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise stated.

principal office in Oakland, Calif. KAAC is a wholly owned subsidiary of Kaiser, with whom it files consolidated returns.

Kaiser, Comalco, Ltd. (Comalco), and Conzinc Riotinto of Australia, Ltd. (CRA), after negotiations of approximately 1½ years, entered into a "memorandum of agreement" on September 29, 1976, pursuant to which they agreed, in part, that KAAC would transfer a 4-percent interest in an Australian alumina processing company, Queensland Australia, Ltd. (hereafter QAL), to Comalco. In addition, CRA owned a 12.5-percent interest in QAL through a wholly owned subsidiary, and CRA agreed to transfer its entire 12.5-percent interest in QAL to Comalco.

Comalco, the transferee of the QAL interests from KAAC and CRA, was incorporated under the laws of the State of Victoria, Australia. Comalco and its subsidiaries are a major producer of bauxite, an aluminum bearing ore that is the raw material of the aluminum industry,[2] as well as an integrated producer of aluminum and aluminum products in Australia. Kaiser and CRA each own a 45-percent interest in Comalco, with the remaining 10-percent interest held by the public of Australia and New Zealand.

The QAL alumina processing company, interests in which were transferred to Comalco, is incorporated under the laws of the State of Queensland, Australia. As of December 31, 1976, 32.3 percent of the stock of QAL was owned by KAAC, Kaiser's subsidiary, 13.8 percent by Comalco, and 12.5 percent by a wholly owned subsidiary of CRA, Pacific Aluminum Pty., Ltd. (PAL). In addition, 21.4 percent of QAL's stock was owned by a subsidiary of Alcan Aluminum, Ltd. (ALCAN), and 20 percent by a subsidiary of Pechiney Ugine Kuhlman (PUK).

QAL was established in 1963 by Kaiser, CRA, Alcan, and PUK solely to provide a facility to process bauxite (to be purchased from Comalco) into alumina for QAL "shareholders," or participants. These four participants organized QAL as a consortium company that charges its participants for alumina-processing services at approximately the cost of those services. The

---

[2]Bauxite is found principally in tropical areas. It is processed into an intermediate product, alumina (aluminum oxide), in an alumina plant, such as QAL. Alumina is reduced by an electrolytic process into primary aluminum in aluminum smelters that usually are located near low-cost power sources.

interests in QAL which Kaiser and CRA agreed to sell to Comalco were thus a portion of their participation rights.[3]

As a part of routine business operations, Kaiser's subsidiary, KAAC, purchases bauxite from Comalco and ships it to QAL to be processed into alumina. Then, KAAC normally sells a substantial amount of such alumina to Kaiser, whereupon Kaiser ships the alumina to the United States where it is reduced to aluminum at Kaiser's west coast smelters.[4]

## The Transaction

The following diagram shows the essential elements of the transactions which were prescribed by the terms of the memorandum of agreement:

| *Kaiser and/or KAAC (petitioners) would receive:* | *Comalco would receive:* |
|---|---|
| Stock issued by Comalco having a value of A$24.5 million[5] | A 4-percent interest in QAL formerly owned by Kaiser |
| | A$5.7 million |
| *CRA and/or its subsidiary PAL would receive (in part):* | *Comalco would receive:* |
| Stock issued by Comalco having a value of A$24.5 million | All of CRA's 12.5-percent interest in QAL |
| | A$3 million |

The complete transaction is as follows: KAAC would transfer to Comalco a 4-percent interest in QAL (representing an entitlement to rated capacity of 80,000 long tons of alumina annually), including all related rights and obligations, and certain shares of two QAL-related financing companies. Kaiser would transfer to Comalco approximately Australian dollars A$5.7 million in cash (subject to adjustment as of a "valuation date"). In exchange, Comalco would issue stock of Comalco to

---

[3]There are certain limitations on the sale and availability of QAL interests. The nature of the ownership interest of QAL is discussed subsequently.

[4]Kaiser processes bauxite into alumina in the United States at two wholly owned alumina plants, and in Jamaica and Australia through interests in a Jamaican company and QAL, respectively. Kaiser obtains the bauxite which it processes in the United States and Jamaica from Jamaican sources and the bauxite which it processes in Australia from Comalco.

[5]"A" denotes Australian currency.

Kaiser and KAAC having a total value of A$24.5 million (subject to later adjustment).

PAL (CRA's wholly owned subsidiary), would transfer to Comalco its entire 12.5-percent interest in QAL (representing an entitlement to rated capacity of 250,000 long tons of alumina annually), including all rights and obligations, and its shares of two QAL-related financing companies, and CRA would transfer approximately A$3 million in cash to Comalco (subject to adjustment as of the valuation date). In exchange, Comalco would transfer its 50-percent interest in Dampier Salt, Ltd., to PAL, issue stock of Comalco to PAL and CRA having a total value of A$24.5 million (subject to adjustment as of the valuation date), assume PAL's liability to repay credit extensions to QAL, and purchase and assume PAL's contracts to sell alumina to third parties.

Comalco would then offer to its public shareholders rights to subscribe for additional Comalco shares at the same price per share as that established for the Comalco shares issued to Kaiser and KAAC, and CRA and PAL, in a number sufficient for the public shareholders to maintain their 10-percent interest in Comalco.

### Purpose of Transaction: Alumina Imbalance

The transaction, negotiated over a period of approximately 1½ years, was principally designed to provide Comalco with an adequate alumina supply. Comalco is an integrated producer of aluminum, and like Kaiser, has need for the alumina processed by QAL. Comalco has an alumina shortfall in relation to the requirements of its alumina smelters, and this shortfall was a matter of concern to both Kaiser and CRA.[6]

### Alumina Imbalance of Kaiser and Comalco

KAAC's 32.3-percent interest in QAL entitled it to take 775,200 long tons of alumina from QAL in terms of QAL's *actual*

---

[6]Kaiser has an interest in Comalco's alumina requirements and financial strength since it is a 45-percent shareholder of Comalco (as is CRA). Comalco has been a significant source of earnings, as Kaiser has received total dividend distributions through 1975 from Comalco of $33.8 million on a total cash investment of $48.3 million. Comalco's announced dividend policy is to declare dividends of not less than 45 percent of its annual earnings after provisions for Australian income taxes. Since 1970, the percentage of Comalco's aftertax earnings distributed to shareholders as dividends has exceeded 50 percent.

capacity. In terms of QAL's *rated* capacity, KAAC is entitled to take 646,000 long tons of alumina. A 12.5-percent interest in QAL represents an actual entitlement to 300,000 long tons and a rated entitlement to 250,000 long tons per year for KAAC, and for Kaiser to have given up this proportion of its share of alumina entitlement would have resulted in a logistical imbalance of Kaiser's supply and demand situation for alumina. However, Kaiser's alumina supply system did have a total surplus of alumina, that is, alumina entitlements in excess of their present and reasonably foreseeable system requirements.

Kaiser normally uses QAL-processed alumina only at its two west coast alumina smelters at Mead and Tacoma, Wash. Kaiser's two west coast smelters, when operating at full capacity, utilize approximately 517,000 long tons per year of Kaiser's actual entitlement of 775,200 long tons of QAL alumina. The balance, the remaining 258,000 long tons, would thus be surplus. Of this amount, Kaiser exchanges approximately 120,000 long tons of QAL entitlement for a like amount of alumina in Sardinia under an agreement with Comalco which expires in 1981. Of the remainder of the entitlement, the bulk of this potential surplus is normally not produced, though some is produced and sold as the supply/demand situation permits to other companies under short-term and long-term contracts. Lacking a market for the surplus, however, Kaiser requests alumina from QAL only at rated capacity, not at actual capacity, even though operating QAL above rated capacity substantially reduces the per-ton cost of producing alumina. Thus, Kaiser's transfer of a 4-percent interest in QAL, representing 96,000 long tons per year of actual capacity (80,000 long tons of rated capacity), is a transfer of alumina entitlement that is surplus to Kaiser's system.

At the time the petition herein was filed, Comalco had a total alumina capacity of 482,000 long tons per year. It was anticipated that Comalco would experience a shortfall of approximately 44,000 long tons when a minor expansion of its smelter at Bell Bay, Tasmania, was completed (by mid–1977). This shortfall will increase to approximately 400,000 to 500,000 long tons per year during 1980 due to (1) the expansion of a smelter in New Zealand in which Comalco owns a 50-percent interest, and for which Comalco is obligated to supply alumina to the Japanese

participants who have unilateral expansion rights; (2) further expansion of Comalco's smelter at Bell Bay, Tasmania; and (3) the construction of a proposed Gladstone smelter in the State of Queensland.

Thus, with Comalco's forecast shortfall increasing from 44,000 long tons in 1977 to 400,000 to 500,000 long tons per year in 1980, Kaiser's transfer of a 4-percent QAL interest will provide Comalco with an additional rated entitlement of 80,000 long tons per year (96,000 actual), while CRA's transfer of a 12.5-percent QAL interest will provide Comalco with an additional entitlement to 300,000 long tons per year at rated capacity (350,000 actual).

### Comalco

A brief history of Comalco will suggest why its need for additional alumina is central to the transaction before us. The formation of Comalco stemmed from the 1955 discovery of substantial deposits of bauxite at Weipa, Australia. In 1960, Comalco was formed, and Kaiser purchased a 50-percent interest for $5.75 million.

Perhaps most important, Comalco now holds an 84-year lease executed by the State of Queensland, Australia, for the development, subject to certain conditions, of the Weipa bauxite deposits. One of the conditions of the lease, that an *alumina* processing plant be constructed in the State of Queensland, was fulfilled by the construction of QAL, at Gladstone, Australia.

Another condition is that an *aluminum* smelter be constructed at Gladstone in the State of Queensland if economically possible. The construction of such a smelter by Comalco and others depends principally upon arranging satisfactory financing and on the availability of sufficient alumina to Comalco to supply the aluminum smelter. There had been discussions with certain countries that expressed an interest in participating in the smelter operation, but neither Comalco nor the potential participants had sufficient alumina to supply a Gladstone smelter. Consequently, an aluminum smelter had not been constructed at Gladstone when this case began.

Comalco's projected alumina shortfall poses special problems with respect to the condition in the lease with the State of Queensland concerning construction of an aluminum smelter at Gladstone. If the construction of such a smelter is economically

possible and Comalco fails to have the aluminum smelter constructed, Comalco could be required to relinquish one-third of its bauxite reserves. The bauxite reserves that Comalco would have to give up would be the more accessible and higher grade bauxite, and this could adversely affect the availability of bauxite to Kaiser.[7]

## Alternatives Considered

In addition to Kaiser's and CRA's attempts to provide Comalco with an adequate alumina supply, other factors entered into the structure of the transaction as well. First, during the course of negotiations, Kaiser, CRA, and Comalco were not able to agree on an alternative means, acceptable to all, of accomplishing the purposes of the transaction finally agreed upon.

Kaiser considered and rejected the following proposed alternative transactions during the course of negotiations with CRA and Comalco:

(i) That CRA transfer its entire 12.5-percent QAL interest to Comalco, and Kaiser transfer none of its interest, or

(ii) That Kaiser and CRA each transfer a 12.5-percent QAL interest to Comalco.

As to the first of the above alternatives, in the early stages of the negotiations, CRA had proposed that it exchange its subsidiary's (PAL) interest in Comalco for Comalco shares, with no participation by Kaiser, which would have given CRA a majority interest in and control of Comalco.[8] Kaiser rejected the proposal because it did not want its equal ownership (and control) with CRA in Comalco to be reduced, particularly in light

---

[7]An additional adverse consequence if Comalco fails to build the smelter arises under a power contract between Comalco and the Queensland power authority. Under the contract, Comalco must pay an escalating penalty, beginning in 1977, of A\$2.4 million per annum to the Queensland power authority for power not taken in relation to power station capacity constructed for the purpose of supplying the proposed Gladstone smelter.

[8]Comalco's outstanding shares are divided into three classes, as follows: class A (14,950,000 shares representing 10 percent of the total shares outstanding) which is held by the public; class B (67,275,000 shares representing 45 percent of the total shares outstanding) which is held by CRA, and class C (67,275,000 shares representing 45 percent of the total shares outstanding) which is held by Kaiser. All of these shares are ordinary shares, the equivalent of common stock in the United States, with equal rights as to dividends and other distributions, and equal voting rights except in the election of directors. Class B and class C shareholders each have the right to elect five directors. Class A shareholders are entitled to elect one special director who does not have the right to vote at directors' meetings except on the declaration of cash dividends. Changes in the voting rights of the special director are currently under discussion.

of its other-purposes contract with Comalco. Pursuant to the other-purposes contract between Kaiser and Comalco, Comalco agreed to sell a substantial amount of bauxite to KAAC, upon request, for purposes other than processing by QAL. By this agreement, Kaiser secured an alternative source of supply to its Jamaican bauxite for its U.S. alumina processing plants.[9] Securing some alternative sources of bauxite supply had been one of the reasons for Kaiser's original and continued investment in Comalco.

In the second alternative, CRA proposed that both CRA and Kaiser have their subsidiaries (PAL and KAAC) each contribute a 12.5-percent interest in QAL to Comalco. Kaiser rejected this proposal because to give up that great an interest in QAL would result in an imbalance in Kaiser's own supply/demand entitlement to the processed alumina which it receives through KAAC from QAL. Kaiser, as an integrated aluminum company, has an internal need for alumina. On the other hand, CRA, one of Australia's largest companies, has never had any internal requirements for alumina.[10]

## Queensland Australia Limited (QAL)

As noted previously, the development of bauxite reserves at Weipa, Australia, by Comalco under their lease with the State of Queensland was made subject to certain conditions. One of these conditions was the construction of an alumina plant in Queens-

---

[9]A condition to the completion of the transaction at issue is that the agreement entered into by Kaiser and Comalco in 1964 giving Kaiser the right to purchase bauxite for worldwide use in quantities not to exceed one-sixth of Comalco's Weipa reserves be replaced by a more detailed and definitive contract. This other-purpose contract, which must be reviewed and approved by the Australian Department of National Resources, will permit Kaiser to purchase up to 196 million tons of bauxite, equivalent to a 40-year supply of bauxite for Kaiser's U.S. alumina plants.

[10]During the negotiations, CRA indicated, without advancing a proposal, that if Kaiser contributed only cash to Comalco and PAL contributed its 12.5-percent interest in QAL to Comalco, then CRA would insist upon valuation of the underlying QAL assets at full replacement cost, unadjusted for depreciation. CRA stated that it valued PAL's 12.5-percent interest in QAL at approximately A$59 million. Kaiser did not pursue this cash-only possibility because it was unwilling to make a cash contribution to Comalco of the magnitude involved.

Kaiser has a limited amount of capital funds and its management is responsible for selecting the projects to which these funds should be allocated. A large cash contribution to Comalco would have necessitated deferring, or dropping altogether, other capital projects, principally domestic projects which are not subject to the risks associated with foreign investments. Thus, the management determined that it could not, as a business matter, justify allocating cash of the magnitude involved to a noncontrolled foreign affiliate.

land, now fulfilled by the QAL alumina processing plant at Gladstone. In initially constructing the QAL plant, however, Comalco and its dominant shareholders (Kaiser and CRA) had been unwilling to commit to the amount of investment necessary to build a plant of sufficient size to be economically feasible. As a result, Alcan Aluminum, Ltd. (Alcan), an integrated Canadian aluminum producer, and Pechinery Ugine Kuhlman (PUK), an integrated French aluminum company, were invited to participate in the QAL alumina plant project with Kaiser and CRA.

QAL was established in 1963 by Kaiser, CRA, Alcan, and PUK as a consortium company solely to provide a facility to process bauxite purchased from Comalco into alumina for QAL participants. QAL is prohibited by agreements among its participants from producing or marketing alumina for its own account. In addition, the different situations of four companies of different nationalities and the necessity of providing a formula for expansion of the alumina plant required QAL to operate as a processing company charging its customers for services at a level slightly above the cost of those services.

The QAL alumina plant was built in four stages denominated the "original plant," "first expansion," "second expansion," and "third expansion."[11] Perhaps most important, a participant's QAL shares are associated with one or more stages of the QAL plant and represent, in part, an entitlement to take a specified amount of alumina processed in that particular stage of the plant.

Initially Kaiser, and subsequently KAAC, held a 52-percent interest in QAL. However, disproportionate participations in expansion of the QAL alumina plant and a sale of QAL shares to Comalco in 1969 had, by 1976, reduced KAAC's interest in QAL to 32.3 percent. Kaiser formed KAAC to satisfy the Australian

---

[11]Four corporations were organized between 1965 and 1970 to facilitate the long-term financing of QAL's operations through the issuance of debentures. Two of the corporations are wholly owned subsidiaries of QAL, while the remaining two corporations, Queensland Alumina Security Corp. (QASC) and Queensland Alumina Holdings N.V. (QAH), are owned directly by QAL participants. QASC is a Delaware corporation organized in 1965 in connection with the issuance of the QAL initial series debentures. QAH is a company organized in the Netherlands in 1967 in connection with the issuance of the QAL series B debentures. Kaiser Alumina owns 52 percent of both QASC and QAH, and PAL owns 8 percent of QASC and QAH. QASC and QAH function as flow-through financing vehicles for QAL—that is, the funds borrowed from third parties by QASC and QAH are in turn loaned by the financing companies to QAL on the same terms established in the initial borrowing. Both companies have nominal capital, neither had net income in 1975 and 1976, and neither have retained earnings.

tax authorities' objections to the lack of taxable income in QAL. Profits realized by KAAC upon its sale (principally to Kaiser) of the alumina it receives from QAL are subject to Australian income tax at a current rate of 42.5 percent.

As of December 31, 1976, share ownership in QAL[12] and the participants' entitlement to QAL's rated and estimated actual alumina capacity were as follows:

| Shareholder | Shares | Percentage | Rated capacity | Estimated actual capacity |
|---|---|---|---|---|
| | | | *Alumina entitlement (in long tons)* | |
| KAAC | 714,000 "A" | 32.3 | 646,000 | 775,200 |
| Alcan | 473,100 "B" | 21.4 | 428,000 | 513,600 |
| PUK | 442,400 "C" | 20.0 | 400,000 | 480,000 |
| Comalco | 306,000 "D" | 13.8 | 276,000 | 331,200 |
| PAL | 276,500 "E" | 12.5 | 250,000 | 300,000 |
| | | 100.0 | 2,000,000 | 2,400,000 |

Each QAL participant had entered into a "take-or-pay" processing agreement with QAL. Pursuant to such agreements, each participant is required to furnish its projected percentage of QAL's bauxite requirements and take its projected percentage of QAL's alumina production. A participant's projected percentage is proportional to its share interest in QAL. If a participant is unable or unwilling to take its percentage of QAL's alumina production, and other participants are unwilling to pick up the unused capacity, the defaulting participant is required to pay a standby fee which is the equivalent of the normal QAL processing fee less savings resulting to QAL from reduced production. Also, if QAL is unable to produce alumina at rated capacity, the resulting shortfall may cause the imposition of standby fees on participants.

---

[12]As of Dec. 31, 1975, QAL had capital stock issued in the amount of A$4,424,000 and had retained earnings of A$81,971,000. This A$81 million is a financial figure made under Australian standards, not an earnings and profits figure for U.S. tax purposes. As of Dec. 1, 1976, QAL's retained earnings for book purposes attributable to the 4-percent interest transferred by KAAC to Comalco were approximately A$3,700,000. As of Dec. 31, 1978, QAL's retained earnings for book purposes attributable to the 4-percent interest transferred by KAAC to Comalco were approximately A$3,900,000.

## *Restrictions on the Disposal of QAL Shares*

A participant's ability to sell or otherwise dispose of QAL shares is restricted by the consortium agreements among the QAL participants and by the documents under which QAL's debentures were issued. One principal restriction is that, under the consortium agreements, a transfer of QAL shares by a participant generally would require both the unanimous consent of the other QAL participants *and* the consent of QAL. While a QAL participant may not arbitrarily withhold consent to the transfer of QAL shares by another participant, it may withhold consent for any legitimate business reason. However, there is an exception under the consortium agreements which permits KAAC and PAL to transfer QAL shares to Comalco without the consent of the other participants or QAL (which is what occurred in the instant transaction).

Another restriction on the transfer of QAL interests is that QAL's authority to consent to a transfer of its shares by a participant is limited by a general debenture trust deed, under which QAL has issued 17 series of debentures (pursuant to a supplemental trust deed executed in connection with each series), 15 of which remained outstanding as of December 31, 1976. In relevant part, the general debenture trust deed provides that so long as any QAL debentures remain outstanding, QAL may not consent to the transfer of its shares unless special trustees under supplemental trust deeds representing more than 50 percent of the principal amount of the outstanding debentures consent to such transfer. In addition, under a special provision of the general debenture trust deed and the first supplemental trust deed, the special trustee for the initial series debentures must consent to the transfer of QAL shares by a participant as long as such debentures are outstanding.

The final restriction upon the transfer of QAL shares is that each supplemental trust deed provides that a special trustee may consent to the transfer of QAL shares only upon receipt of instructions signed by holders of not less than a specified percentage of the outstanding debentures in that series. The table on page 337 sets forth the requisite percentage of debenture holders in each series that must authorize the special trustee to act before such trustee is permitted to consent to a transfer of QAL shares. The table also describes generally the holders of each debenture series, the amount outstanding as of

December 13, 1976, and the final due date of each debenture series.[13]

## Application of Section 367

### A. Introduction

Based upon the preceding information, petitioners filed a letter with respondent on December 17, 1976, requesting a ruling that its transaction is one described by sections 351 and 367(a)(1). At respondent's request, petitioners supplied additional information on January 24, 1977. Respondent issued an adverse determination letter with respect to the transaction on May 9, 1977, concluding that the transaction was in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes within the meaning of section 367.

On May 31, 1977, petitioners submitted a protest of the adverse determination, in which they offered to enter into a closing agreement agreeing, for a 10-year period, to include in income in any taxable year in which a disposition of the QAL stock by Comalco occurred, the gain it would recognize currently if the transaction were regarded as a taxable exchange.

Nevertheless, respondent subsequently issued a final adverse determination letter under section 367 setting forth the following two grounds for his determination:

(a) Since * * * [Comalco] is not a controlled foreign corporation, gain recognized by it for the sale of * * * [QAL] stock would escape U.S. tax, whereas absent the proposed transaction, any gain on the appreciated stock would be taxable to * * * [Kaiser] in the U.S.

(b) The business purposes sought to be accomplished by the proposed transaction could reasonably be accomplished by means other than a transfer of stock under Section 351. Therefore, the facts and circumstances submitted

---

[13]In addition, each QAL participant is obligated to make its respective share of debt service payments directly to trustees representing QAL's various lenders. Such payments are treated as advance payments by the participants of QAL processing charges.

Also, each QAL participant is obligated to advance funds to QAL for working capital and for certain capital improvements if necessary. Since the QAL alumina plant always has been capable of operating at rated capacity, QAL has been able to finance its own working capital and capital improvement needs.

Finally, QAL extends credit allowances to its participants to the extent that the processing charges owed by them exceed QAL's cash requirements. Such credit allowances are subject to demand for payment at any time upon 30 days' notice by QAL. Credit allowances are not uniform as among participants because the QAL alumina plant was constructed in four stages with varying participants' interests and financing involved in each stage. As of Dec. 31, 1975, QAL had not extended any credit allowances to KAAC with respect to the first expansion of the alumina plant.

| QAL debenture series[1] | Amount outstanding as of 12/31/76 (U.S. dollars) | Final due date | Debenture holders | Minimum percentage of debenture holders needed for special trustee to consent to transfer of QAL shares |
|---|---|---|---|---|
| 1. Initial series (1st supp. trust deed) | 74.9 MM | 1992 | Four U.S. insurance companies and two U.S. banks | 66⅔% |
| 2. Series B (2d supp. trust deed) | 13.5 MM | 1982 | Bearer bonds (Eurodollar) | 50 + % |
| 3. Series D (4th supp. trust deed) | 3.3 MM | 1977 | National Bank of Australasia | 50 + % |
| 4. Series E (5th supp. trust deed) | 5.1 MM | 1979 | National Bank of Australasia | 50 + % |
| 5. Series F (6th supp. trust deed) | 9.9 MM | 1985 | Australian Mutual Provident Society | 50 + % |
| 6. Series H (8th supp. trust deed) | 45.0 MM | 1985 | Twelve German banks | 66⅔% |
| 7. Series I (9th supp. trust deed) | 14.0 MM | 1982 | Bearer bonds (Eurodollars) | 50 + |
| 8. Series K (11th supp. trust deed) | 5.9 MM | 1978 | Approximately nine U.S. banks | 66⅔% |
| 9. Series L (12th supp. trust deed) | 4.4 MM | 1980 | National Bank of Australasia | 50 + % |
| 10. Series M (18th supp. trust deed) | 9.1 MM | 1992 | Australian Mutual Provident Society | 50 + % |
| 11. Series N (14th supp. trust deed) | 37.5 MM | 1985 | Bearer bonds (Deutschemark) | 66⅔% |
| 12. Series O (15th supp. trust deed) | 28.8 MM | 1986 | Bearer bonds (Eurodollar) | 50 + % |
| 13. Series P (16th supp. trust deed) | 23.5 MM | 1987 | Bearer bonds (Eurodollar) | 50 + % |
| 14. Series Q (17th supp. trust deed) | 9.3 MM | 1990 | Thirty-three (33) Australian Institute investors | 50 + % |
| 15. Series R (18th supp. trust deed) | 50.0 MM | 1992 | Four U.S. insurance companies, one U.S. bank, and the Presbyterian Church | 66⅔% |

[1] Series C and G have been repaid and retired. Series J was never issued.

by * * * [Kaiser] do not override the *presumption* under Section 2.02 of Rev. Proc. 68–23, 1968–1 C.B. 821 that "one of the principal purposes" of the transaction is the avoidance of Federal income taxes. [Emphasis added.]

However, respondent's final adverse ruling also stated that the transaction would be determined *not* to be in pursuance of such a plan if petitioners would agree to include in their gross income for the taxable year in which the transfer occurred an appropriate amount to reflect realization of income or gain with respect to the transfer.

## B. *History of Statutory Provisions*

Section 367 provides in relevant part:

SEC. 367. FOREIGN CORPORATIONS.

(a) TRANSFERS OF PROPERTY FROM THE UNITED STATES. —

(1) GENERAL RULE.—If, in connection with any exchange described in section 332, 351, 354, 355, 356, or 361, there is a transfer of property (other than stock or securities of a foreign corporation which is a party to the exchange or a party to the reorganization) by a United States person to a foreign corporation, for purposes of determining the extent to which gain shall be recognized on such transfer, a foreign corporation shall not be considered to be a corporation unless, pursuant to a request filed not later than the close of the 183d day after the beginning of such transfer (and filed in such form and manner as may be prescribed by regulations by the Secretary), it is established to the satisfaction of the Secretary that such exchange is *not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes.*[14] [Emphasis added.]

The predecessor of section 367 was enacted as part of the Revenue Act of 1932, Pub. L. 154, 47 Stat. 169. Congress explained the focus of its concern as follows:

Property may be transferred to foreign corporations without recognition of gain under the exchange and reorganization sections of the existing law. This constitutes a serious loophole for avoidance of taxes. Taxpayers having large unrealized profits in securities may transfer such securities to corporations organized in countries imposing no tax upon the sale of capital assets. Then, by subsequent sale of these assets in the foreign country, the entire tax upon the capital gain is avoided. * * * [H. Rept. 708, 72d Cong., 1st Sess. 20 (1932), 1939–1 C.B. (Part 2) 457, 471.]

---

[14]If a corporation is not considered to be a corporation, the exchange will not be tax free, since corporate status is essential to tax-free organization, liquidation, or reorganization by reason of the use of the term "corporation" in secs. 332, 351, 368(a)(1), 354, and 361. B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 17.40, p. 17–57 (3d ed. 1971). The instant case falls within the bounds of sec. 367 by virtue of the sec. 351 exchange. After the transfer of QAL stock by Kaiser and CRA to Comalco, Kaiser and CRA are in control (as defined in sec. 368(c)) of Comalco.

Congress went on to provide a specific example representative of its concern:

For example, A, an American citizen, owns 100,000 shares of stock in Corporation X, a domestic corporation, which originally cost him $1,000,000 but now has a market value of $10,000,000. Instead of selling the stock outright A organizes a corporation under the laws of Canada to which he transfers the 100,000 shares of stock in exchange for the entire capital stock of the Canadian company. This transaction is a nontaxable exchange. The Canadian corporation sells the stock of Corporation X for $10,000,000 in cash. The latter transaction is exempt from tax under the Canadian law and is not taxable as United States income under the present law. The Canadian corporation organizes Corporation Y under the laws of the United States and transfers the $10,000,000 cash received upon the sale of Corporation X's stock in exchange for the entire capital stock of Y. The Canadian corporation then distributes the stock of Y to A in connection with a reorganization. By this series of transactions, A has had the stock of X converted into cash and now has it in complete control. [H. Rept. 708, 72d Cong., 1st Sess. 20 (1932), 1939–1 C.B. (Part 2) 457, 471. See also S. Rept. 665, 72d Cong., 1st Sess. 26–27 (1932), 1939–1 C.B. (Part 2) 496, 515.]

Until 1968, there was considerable confusion as to the circumstances under which a ruling by the Service was required, and as to when a transaction would receive a favorable ruling. This was especially true after the Revenue Act of 1962, Pub. L. 87–834, 76 Stat. 960, which extended the application of section 367 to subpart F controlled foreign corporations. In an attempt to provide some clarification, the Service in 1968 published relatively comprehensive guidelines as to when a ruling was necessary and the conditions upon which a favorable ruling would ordinarily be issued. Rev. Proc. 68–23, 1968–1 C.B. 821. The following language from Rev. Proc. 68–23 is directly applicable to the facts before us:

SEC. 3. TRANSACTIONS WHICH ORDINARILY RECEIVE FAVORABLE CONSIDERATION UNDER SECTION 367 OF THE CODE.

.02 Section 351 of the Code. Transfer to foreign corporation controlled by transferor.

(1) Where property is transferred to a foreign corporation and such property is to be devoted by the transferee foreign corporation to the active conduct, in any foreign country, of a trade or business * * * It is contemplated that the transferee foreign corporation, in addition to the active conduct of a trade or business, will have need for a substantial investment in fixed assets in such business or will be engaged in the purchase and sale abroad of manufactured goods.

(a) However, a favorable ruling under section 367 of the Code will not be issued for an exchange described in section 351 of the Code where the property

to be transferred to the foreign corporation is one of the following kinds of property:

(i) Property described in section 1221(1) of the Code (relating to inventory or other property held for sale to customers) or section 1221(3) of the Code (relating to copyrights, etc.);

(ii) Property, such as accounts receivable or installment obligations, in respect of which income has been earned, unless the income attributable to such property has been or will be included in the gross income of the transferor for Federal income tax purposes;

(iii) Stock or securities * * *

Despite the specificity of the guidelines, the revenue procedure states that whether tax avoidance is a principal purpose within the meaning of section 367 "depends on all the facts and circumstances of each case." In this connection, the revenue procedure states:

a taxpayer shall be free to establish that based on all the facts and circumstances of the taxpayer's case a favorable ruling under section 367 of the Code should be issued, notwithstanding a contrary statement or implication contained in the guidelines. * * * [1968–1 C.B. 821, 822.]

The Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1520, restructured section 367 significantly and enacted section 7477 to provide for judicial review by this Court of section 367 determinations made by the respondent. (See J. Eustice, "The Tax Reform Act of 1976: Corporate Changes Revisited," 33 Tax L. Rev. 115, 121–125 (1977).)

In connection with these 1976 amendments, Congress stated that:

the statutory standard for determining that a transaction does not have as one of its principal purposes tax avoidance has evolved through administrative interpretation into a requirement generally that tax-free treatment be permitted only if the U.S. tax on accumulated earnings and profits (in the case of transfers into the United States by a foreign corporation) or if the U.S. tax on the potential earnings from *liquid* or *passive* investment assets (in the case of transfers of property outside the United States) is paid *or* is preserved for future payment. [S. Rept. 94–938 (1976), 1976–3 C.B. (Vol. 3) 300. Emphasis added.]

While expressing "general" approval of "the standard applied by the IRS," Congress emphasized that "there may be cases where the standards are inappropriate or are not being correctly applied," concluding that "it is fair to permit taxpayers to litigate these questions in the courts." S. Rept. 94–938, *supra*, 1976–3 C.B. (Vol. 3) at 301.

Congress explained the role of this Court in some detail:

The Tax Court is to review whether the Secretary's determination as to tax avoidance is reasonable and whether the conditions imposed in making the determinations are reasonable conditions in order to prevent the avoidance of income tax. * * *

\* \* \* \* \* \* \*

The court is to base its determination upon the reasons provided by the Internal Revenue Service in its notice to the party making the request for a determination, or upon any new matter which the Service may wish to introduce at the time of the trial. *The Tax Court judgment, however, is to be based upon a redetermination of the Internal Revenue Service's determination.* * * * [S. Rept. 94–938, *supra*, 1976–3 C.B. (Vol. 3) at 304. Emphasis supplied.]

Petitioners contend that the facts and circumstances surrounding the transaction affirmatively demonstrate that the transfer by Kaiser of QAL stock to Comalco is not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes within the meaning of section 367. They point out that their transfer of QAL stock was for a business purpose, and that this business purpose could not reasonably be accomplished by means other than a transaction involving the transfer by KAAC of QAL stock to Comalco. In addition, petitioners assert that none of the parties to the transaction plans or contemplates a subsequent sale or other disposition by Comalco of the QAL stock transferred to it by KAAC, and that respondent was thus unreasonable in basing his adverse determination on hypothetical sales possibilities when the facts and circumstances negate any practical prospect of a subsequent sale of the QAL stock by Comalco.

In addition, petitioners contend that respondent's application of a virtually irrebuttable presumption of tax avoidance to an outbound transfer of stock or securities demonstrates that respondent's determination was not reasonable, and that, for purposes of section 367, the QAL stock should be viewed as an interest in tangible operating assets, rather than as a liquid or passive investment asset.

Respondent, on the other hand, contends that petitioners' business purposes for the transfer do not render section 367 inapplicable. Respondent asserts that Congress, in amending section 367 and in enacting section 7477, sanctioned respondent's position in Rev. Proc. 68–23, 1968–1 C.B. 821, that when liquid or passive assets (stock or securities) are transferred outside the United States, the transfer is presumed to be in pursuance of a

plan having as one of its principal purposes the avoidance of income tax.

Respondent further contends that the likelihood of subsequent disposition by the transferee is not relevant, once he has considered *objective* factors such as the *nature* of the asset transferred. Respondent states that QAL stock is stock or securities within the meaning of Rev. Proc. 68–23, *supra*, and not operating assets, and that, accordingly, the Commissioner properly applied the presumption of tax avoidance in his determination in the instant transaction regardless of the business motives for the transfer. In respondent's words, "the tax avoidance motive has been presumed from the nature of the assets transferred and the fact of tax avoidance."

*C. Principal Purpose Not Tax Avoidance*

In *Dittler Bros., Inc. v. Commissioner*, 72 T.C. 896 (1979), we adopted the substantial evidence rule as the appropriate scope of review for section 7477 actions, stating:

it is important to summarize exactly what we perceive petitioner's burden of proof to be. It is to establish from all the underlying facts and circumstances of the case that respondent's determination was not reasonable in that it was not based upon substantial evidence. * * * [*Dittler Bros., Inc. v. Commissioner*, 72 T.C. at 915.]

After careful consideration of the entire record, including the *nature* of the transaction *and* the QAL interest transferred, we conclude that respondent's determination that the transfer herein was in pursuance of a plan having tax avoidance as one of its principal purposes was not reasonable in that it was not based on substantial evidence.

Our reasoning begins, as respondent requests, with the guidelines provided in Rev. Proc. 68–23, 1968–1 C.B. 821. We recognize that to the extent Congress "generally" approved of the guidelines, it sanctioned the use of categories, or "molds," into which certain routine transactions would fit. Thus, if the property transferred had clearly been inventory, for example, the transaction would have come within section .02(1)(a)(i) of the guidelines, and thus it would "fit the mold" of one type of property described in the guidelines generally ineligible for a favorable section 367 ruling. Similarly, stock or securities is another guideline category, *generally* ineligible for a favorable ruling. However, in any case, whether the category involved is inventory, stock, or another item, the guidelines specifically and

unequivocally state that a transfer may always qualify on the basis of all the facts and circumstances.

Respondent erred in mechanically assuming that the QAL interest transferred is stock and that the stock is also a liquid or passive investment *within the meaning of the guidelines*. Additionally, even assuming that he correctly categorized the assets transferred, in automatically presuming therefrom that a principal purpose of the transfer is tax avoidance, he gives insufficient recognition to the provisions of the guidelines specifically permitting a transfer to qualify for a favorable section 367 ruling on all of the facts and circumstances.

We believe the QAL interest transferred is stock in form and name only, and in substance and reality is closely akin to operating assets. Petitioners' QAL interest simply represented certain *rights* and *duties* (or benefits and burdens) not associated with stock ownership—the *right* to provide bauxite to QAL and have it processed into alumina, and the *right* to receive the processed alumina in proportion to their interest in QAL. In addition, petitioners' QAL interest obligated them to certain *duties* in regard to their interest—to supply bauxite in proportion to their interest in QAL to the QAL operation, as all other interest-holders were obliged to do, and to take their proportionate share of the processed alumina, regardless of their need for it.

QAL shares and the alumina entitlement they represent are directly associated with the four stages of the QAL plant. QAL consortium participants entered into a "take or pay" agreement imposing standby fees when the participant is unable to take its projected percentage of alumina. And significantly, a participant's projected percentage is proportional of its share interest in QAL. A standby fee is also imposed if QAL is unable to produce alumina at its rated capacity.

Additionally, the QAL interest sold to Comalco was not readily marketable. It could not be sold to any company except Comalco by petitioners without obtaining the approval of QAL debenture holders. Although the primary characteristic of ownership of a share of stock is the "right to share proportionately in the profits of the business," QAL, as a consortium company, was restricted by its articles of incorporation to receiving bauxite from its owners-shareholders—(the consorti-

um members) and processing that bauxite into alumina for a fixed price, which was slightly above cost.[15]

QAL was specifically prohibited from engaging in any other activities or selling any processed alumina to any one other than the consortium members. This is not the kind of operation designed to produce significant profits or an economic return on a shareholder's investment. Although there is some controversy as to whether QAL is a true cost company,[16] it is clear that it does not have the return on investment in "a liquid or passive holding" which is typical of an investment in stock representing a share in the profits of a business.

On the particular facts before us, QAL stock was not a portfolio investment providing a "passive" return on funds invested, nor was it "liquid" by any stretch of imagination. Indeed, on brief, respondent admits that "In one sense, ownership of the QAL stock is equivalent to ownership of the production assets." Respondent has simply misapplied his own guidelines to the unique circumstances presented.

Even assuming that respondent correctly categorized the QAL interest transferred, in presuming that this categorization automatically means that a principal purpose of the transfer is tax avoidance, he gives insufficient recognition to the provisions of the guidelines specifically permitting a transfer to qualify for a favorable section 367 ruling on all of the facts and circumstances. First, for the reasons discussed above, the property transferred is in reality an interest in an alumina processing facility constructed solely for the use of the consortium participants. Additionally, the facts and circumstances demonstrate that the transfer was motivated solely by business consider-

---

[15]Bittker & Eustice state regarding stock:

"Ordinarily, a share of 'stock' embodies the permanent proprietary ownership or equity interest in a corporation which entitles the holder to (a) *share proportionately in the profits of the business*; (b) vote on matters affecting the corporate enterprise; and (c) share ratably in the assets of the venture (after payment of debts) on liquidation. [B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 14.73, p. 14–31 (3d ed. 1971). Emphasis added.]"

[16]QAL's processing fees are set somewhat above cost in order to take advantage of the investment allowance available for Australian tax purposes. The result is that QAL shows a profit for financial statement purposes, but has no income for Australian tax purposes. Respondent contends that QAL is not a true cost company since it was allowed to earn and retain some profits to take advantage of these Australian tax benefits.

ations. On this record, it cannot be candidly contended that tax avoidance was "a principal purpose" of the transfer.

We have outlined in our findings the business objectives motivating Comalco's owners, Kaiser and CRA, to transfer part of their interests in QAL to Comalco. These included Comalco's present and prospective alumina shortfall; the potential loss of one-third of Comalco's bauxite reserves at Weipa under the lease with the State of Queensland if an alumina smelter is not built; and the substantial penalties that Comalco is incurring with the Queensland power authority for not taking power made available for the proposed Queensland alumina smelter.

It was Comalco's shortfall and the ensuing adverse economic consequences that prompted CRA and Kaiser to negotiate the transaction before us. The negotiations were conducted at arm's length, and extended over a considerable period of time. The interest transferred improved Comalco's position (Comalco being a major source of earnings to Kaiser), maintained Kaiser's ownership in Comalco, and met Comalco's shortfall consistent with Kaiser's own needs for alumina. The transaction responded to the business exigencies facing the participants and was structured by the interests of both CRA and Kaiser during protracted negotiations.[17]

Respondent does not argue a great deal about this because he has adopted a theory that minimizes the significance of business purpose. He tells us on brief:

> Respondent does not question that Kaiser had business reasons for structuring its transaction in the contemplated manner. Nor, does respondent perceive the transaction as an opportunity for Kaiser to convert the 4% QAL interest into cash free of U.S. tax. Simply, the transfer of appreciated stock from the United States, in exchange for stock of Comalco, is an appropriate occasion for the United States to ask for its rightful share of the profit.

Indeed, respondent takes the view that his identification of the interest as "stock" in itself requires that the transfer be treated as a currently taxable sale or exchange. Respondent states that "the tax avoidance motive has been presumed from the nature of the assets transferred and the fact of tax

---

[17]In this connection, our comments in *Dittler Bros., Inc. v. Commissioner*, 72 T.C. 896, 919 (1979), are relevant:

"Respondent's determination is largely based upon the assumption that petitioner controlled the form and structure of the transaction, but there is insubstantial evidence in the record to support such a determination."

avoidance." Consequently, he goes on to say that "the likelihood or unlikelihood of subsequent disposition by the transferee is not relevant," and that "the presence of the most compelling business purposes imaginable does not lessen the tax avoided by one cent." We believe that respondent has simply ignored the provisions of his own guidelines that allow the taxpayer (despite the category of the assets transferred) to qualify for a favorable ruling on the basis of all the facts and circumstances. This is a case where the standards "are not being correctly applied," and for which Congress in 1976 specifically provided the opportunity for taxpayers to litigate. S. Rept. 94–938, 1976–3 C.B. (Vol. 3) at 301.[18]

## D. Terms and Conditions

Section 7477 directs this Court to review "a determination by the Secretary" that a principal purpose of an exchange is tax avoidance, *or* of the terms and conditions necessary to eliminate tax avoidance as a principal purpose. The statute seems to say that only if we first conclude that a finding of tax avoidance is unreasonable, do we go on and review the terms and conditions imposed by the respondent.[19] But this plausible reading of the

---

[18]This may not be an atypical approach in the administrative process. In 1970, "The Report of the President's Task Force on Business Taxation" stated in regard to the guidelines of Rev. Proc. 68–23, 1968–1 C.B. 821:

"In practice * * * the guidelines can operate heavily against a taxpayer who is unable to bring his case within any of the specific tests set forth therein. Although the guidelines state that a taxpayer is to be free to establish that, under all the facts and circumstances of his case, a favorable ruling should be issued 'notwithstanding a contrary statement or implication contained in the guidelines,' the tendency of Service personnel who process ruling applications is to regard the tests set forth in the guidelines as imposing ironclad rules, and to insist on their application even when a reasonable factual approach would indicate the absence of any tax avoidance purpose. * * * [See "The Report of the President's Task Force on Business Taxation," 24 Tax Law. 395, 411 (1971).]"

[19]The statute reads as follows:

SEC. 7477. DECLARATORY JUDGMENTS RELATING TO TRANSFERS OF PROPERTY FROM THE UNITED STATES.

 (a) CREATION OF REMEDY.—

  (1) IN GENERAL.—In a case of actual controversy involving—

  (A) a determination by the Secretary—

   (i) that an exchange described in section 367(a)(1) is in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes, or

   (ii) of the terms and conditions pursuant to which an exchange described in section 367(a)(1) will be determined not to be in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes, or

  (B) a failure by the Secretary to make a determination as to whether an exchange described in section 367(a)(1) is in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes,

statute creates severe anomalies. For it directs us to consider terms and conditions necessary to prevent tax avoidance only when we have found the Secretary unreasonable in finding tax avoidance in the first instance. Put another way, only after finding it unreasonable to see a principal tax-avoidance purpose would we review terms and conditions to prevent what it is unreasonable to see.

We believe the statute can only be properly understood by focusing on the different circumstances Congress had in mind. For example, Congress realized that outbound section 351 transfers sometimes include "certain types of assets (*e.g.*, inventory, accounts receivable, and *certain* stock or securities) transferred to the foreign corporation *as part* of the transfer." (S. Rept. 94–938, *supra*, 1976–3 C.B. (Vol. 3) at 300. Emphasis added.) Respondent was given two options. At the outset, he could simply conclude that the entire transaction was inherently and incorrigibly contaminated with a principal tax-avoidance motive. If his determination was reasonable, the statute would require that we sustain his ruling without being presented with terms and conditions; if his determination improperly found a principal tax-avoidance purpose, petitioner would win without regard to terms and conditions. However, if respondent was unreasonable in finding an *incorrigible* principal tax-avoidance purpose, he would have erred in failing to propose corrective terms and conditions, and the issue of appropriate terms and conditions would then be raised.

Alternatively, respondent could conclude that a principal tax-avoidance purpose was present, but that it could be obviated by the imposition of terms and conditions. Under this alternative, respondent would be conceding the correctibility of a principal tax-avoidance purpose, and the only issue before us would be the

---

upon the filing of an appropriate pleading, the Tax Court may make the appropriate declaration referred to in paragraph (2). Such declaration shall have the force and effect of a decision of the Tax Court and shall be reviewable as such.

(2) SCOPE OF DECLARATION.—The declaration referred to in paragraph (1) shall be—

(A) in the case of a determination referred to in subparagraph (A) of paragraph (1), whether or not such determination is reasonable, and, if it is not reasonable, a determination of the issue set forth in subparagraph (A)(ii) of paragraph (1), and

(B) in the case of a failure described in subparagraph (B) of paragraph (1), the determination of the issues set forth in subparagraph (A) of paragraph (1).

existence of a principal tax-avoidance purpose and the terms and conditions appropriate to eliminate it.[20]

Even assuming we are wrong in failing to find a principal tax-avoidance purpose in the instant case, we are certain that respondent erred in consistently refusing to propose terms and conditions. For we are convinced that any principal tax-avoidance purpose, if one there be, would have been obviated by appropriate terms and conditions if respondent had been willing to participate in the process of working them out. Accordingly, the parties were directed to jointly work out terms and conditions that might be appropriately imposed if the Court decided that respondent erred in initially concluding (without regard to any terms and conditions) that a principal tax-avoidance purpose was involved requiring that the transfer be treated as a currently taxable sale or exchange.

Nevertheless, respondent has consistently taken an all or nothing approach, preferring to go to the decision line solely on the basis of his initial conclusion that the entire transaction was incurably infected with a principal tax-avoidance purpose. Respondent's position is that the tax is due now, at the time of the transfer, that a closing agreement is not an appropriate substitute for payment of the tax, and that any closing agreement would be difficult for the Service to monitor. Consequently, when the Court ordered supplemental briefs, dealing solely with terms and conditions, respondent adhered to his legal position, declined to deal with terms and conditions, and simply used his supplemental brief to reargue his legal theories.[21]

Respondent's position may well have merit under broader facts squarely presenting the issue, but those are clearly not the

---

[20]The statute directs us to consider the issue "set forth in subparagraph (A)(ii)" (terms and conditions) when the respondent was unreasonable in declining to do so—that is, when he was unreasonable in finding the entire transaction incorrigibly contaminated. Our reading of the statute is fortified by the procedures plainly prescribed when the Secretary fails to act on a ruling request. (Sec. 7477(a)(1)(B).) We are then directed to determine whether tax avoidance is a principal purpose of a transaction, and if so, whether there are any appropriate terms and conditions that may be imposed to obviate the avoidance. (See sec. 7477(a)(2)(B).) We believe Congress intended essentially the same procedure when a ruling is issued.

[21]Respondent's ruling simply treated the transfer as a taxable exchange ignoring the provisions of sec. 351. On the facts of this case, to euphemistically describe the tax due as a toll charge does not raise the issue of terms and conditions appropriate to preserve the tax for future payment, and respondent does not really contend otherwise. Indeed, as noted above, his basic position is that the tax is due now without regard to terms and conditions.

facts before us. We limit ourselves to the narrow holding that his approach is not justified on the rather unusual and particularly unique facts before us. In this connection, we observe that even in the case of "liquid or passive investment assets," Congress, in enacting the 1976 amendments, noted that the Service rules favorably "if the tax * * * is paid *or* preserved for future payment." Additionally, Congress identified one of the administrative problems addressed as the practice of imposing an immediate tax "even though there is no present tax avoidance purpose but, rather, only the existence of a potential for future tax avoidance." (S. Rept. 94–938, *supra*, 1976–3 C.B. (Vol. 3) at 301.)

We do not believe Congress wanted the Court to draft involved documents in the nature of closing agreements for the respondent to administer when respondent not only disclaims any interest in the product, but refuses to participate in the development process. In this connection, we note that Congress anticipated that we would review a determination made by respondent:

> The Tax Court is to review whether *the Secretary's determination* as to tax avoidance is reasonable *and whether the conditions imposed in making the determinations* are reasonable conditions in order to prevent the avoidance of income tax. If the Tax Court finds that the *Secretary's terms and conditions are not reasonable,* then the Tax Court is to make a declaration as to the terms and conditions which it finds to be reasonable in order to prevent the avoidance of income taxes. [S. Rept. 94–938, *supra*, 1976–3 C.B. (Vol. 3) at 304. Emphasis added.]

As noted, respondent has consistently declined to propose any terms and conditions, preferring to test his position that when a liquid or passive investment in stock or securities is transferred, there is an automatic presumption of a principal tax-avoidance purpose producing a currently taxable transaction.

We do not criticize respondent, for he is charged with administering a difficult law and is entitled to test his theory.[22] But his all or nothing theory, for the reasons given, is misapplied to the peculiar facts before us and at odds with the application of

---

[22] When respondent consistently fails to honor a request by the Court to propose terms and conditions, it adds to the difficulty of determining whether terms and conditions should be imposed (that is, whether a transaction is incorrigibly contaminated) and the nature of any terms and conditions that may be appropriate. Since the particular facts before us are unique, it is difficult to understand why respondent was so adamant.

section 367 Congress anticipated in enacting the 1976 amendments. Respondent's determination is unreasonable within the meaning of section 7477(a)(2)(A); since he has refused to propose any terms and conditions, we decline to impose any under the circumstances. See *Dittler Bros., Inc. v. Commissioner*, 72 T.C. 896, 919, 920 (1979).

*An appropriate decision will be entered.*