ROBERT G. PITCHER, MILLARD G. TRASK, MARY JANE
WESTERMARK, M. K. JONES, PETITIONERS *v.* COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT

Docket No. 21823–82T.    Filed January 23, 1985.

*Richard A. Munson, Isabel S. Schneider,* and *Daniel Manry,* for the petitioners.

*Alfred C. Bishop, Jr., Deborah Y. Clark,* and *L. Michael Wachtel,* for the respondent.

## OPINION

TANNENWALD, *Judge:* Respondent determined that petitioners' transfer of stock to a Canadian corporation was "in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes," within the meaning of section 367,[1] and that the transaction thus fails to qualify for nonrecognition treatment under section 351 or 368(a)(1)(B). Having met all jurisdictional prerequisites,[2] petitioners timely filed their petition for a declaratory judgment with this Court pursuant to section 7477(a).[3] The issue presented for our

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue, and all Rule references are to this Court's Rules of Practice and Procedure.

[2] See sec. 7477(b). See also *infra* note 14.

[3] Sec. 7477(a) provides:

(1) IN GENERAL.—In a case of actual controversy involving—
 (A) a determination by the Secretary—
  (i) that an exchange described in section 367(a)(1) is in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes, or
  (ii) of the terms and conditions pursuant to which an exchange described in section 367(a)(1) will be determined not to be in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes, * * *

\*       \*       \*       \*       \*       \*       \*

upon the filing of an appropriate pleading, the Tax Court may make the appropriate declaration

decision is whether respondent's determination was reasonable.

The case was submitted for decision on the stipulated administrative record under Rule 122. This reference incorporates the administrative record herein. We assume the facts as represented therein to be true for the purposes of this proceeding. Rule 217(b)(1).

At the time they filed their petition, petitioners Millard F. Trask and M.K. Jones resided in Billings, Montana; petitioner Robert G. Pitcher resided in Red Lodge, Montana; and petitioner Mary Jane Westermark resided in Shelby, Montana. Each is experienced in the oil and gas business, and none of the petitioners is related to the others in any way. Petitioners are each considered U.S. shareholders.

Before completion of the transaction in issue, petitioners held approximately 63 percent of the 1,622,800 issued and outstanding shares of Yellowstone Petroleums, Inc. (YPI).[4] YPI, a Montana corporation engaged in the oil and gas exploration business, owned property in Montana, North Dakota, and Colorado; all of its business activities have taken place in the United States. The remaining 37 percent of the YPI shares was held by Canadian corporations and individuals,[5] i.e., not "U.S. shareholders."

In 1980, YPI had lease interests in numerous oil and gas properties in the United States, but found itself with insufficient cash to commence drilling on these properties. Under the typical lease agreements, YPI was required to commence drilling in order to retain its interest in the properties; if these drilling obligations were not met, YPI faced a substantial risk of losing potentially profitable property interests. Moreover,

---

referred to in paragraph (2). Such declaration shall have the force and effect of a decision of the Tax Court and shall be reviewable as such.

(2) SCOPE OF DECLARATION.—The declaration referred to in paragraph (1) shall be—

(A) in the case of a determination referred to in subparagraph (A) of paragraph (1), whether or not such determination is reasonable, and, if it is not reasonable, a determination of the issue set forth in subparagraph (A)(ii) of paragraph (1) * * *

[4]Of the 1,622,800 shares, petitioner Pitcher held 348,120 shares (21.5%), petitioner Trask held 470,920 shares (29.0%), petitioner Westermark held 113,760 shares (7.0%), and petitioner Jones held 90,000 shares (5.5%). There is some confusion as to whether petitioner Jones owned 90,000 or 45,000 shares of YPI before the exchange with YPL, but, in any event, after the exchange, he held 90,000 shares of YPL. Resolution of the question of 45,000 versus 90,000 shares before the exchange is not necessary to our decision herein.

[5]Kandex Resources & Development, Inc., held 240,000 shares, Locke Asset Management, Ltd., held 240,000 shares, Calto Development, Ltd., held 108,000 shares, and Alfred D. Friesen held 12,000 shares.

YPI needed capital to acquire additional properties. The management of YPI found that a public stock offering would be the most rapid and cost-effective method with which to raise the requisite capital. A domestic public offering would have entailed excessive expenditures of time and money because of the necessity of registration of the offering with the U.S. Securities and Exchange Commission (SEC). Thus, management decided upon a foreign public offering. Canada was chosen as the optimal location for the offering because of the geographic location of YPI, prior joint venture dealings and business contacts with Canadian investors, the relation of one of the Canadian shareholders with a brokerage firm in Calgary, and the belief that the Canadian market would be more receptive to the offering than would the U.S. market.

Initially, management considered offering YPI stock on a Canadian exchange. However, the SEC became aware of this plan and expressed its concern about the fact that YPI had not registered its offering. To avoid problems with U.S. securities laws, attorneys for YPI advised the SEC that severe restrictions would be placed on the offered YPI shares, namely, a legend stating that transfers were to be made in Canada, only, and that no transfers were to be made to any citizen or resident of the United States, or to any agent of U.S. citizens or residents.

However, these restrictions so impaired the marketability of the YPI shares that the transfer agent and underwriter would not accept the YPI stock so legended. Thus, management decided to form a Canadian corporation—Yellowstone Petroleums, Ltd. (YPL)—to act as a holding company with its only assets being all the outstanding stock of YPI, and to offer the shares of YPL on the Canadian exchange. The transaction to which petitioners' ruling request referred, entailed (1) an exchange by the eight YPI shareholders of all their outstanding YPI shares for an equal number of YPL shares, and, shortly thereafter, (2) a public offering on a "best efforts" basis[6] for between 500,000 and 1 million shares of YPL on a Canadian exchange. After the first step of the transaction, YPI would become a wholly owned subsidiary of YPL, the former

---

[6]It appears that the public offering, which was eventually made, was accomplished on an underwriting, rather than on a "best efforts" basis, but this difference has no bearing on our decision herein.

shareholders of YPI would own 84.6 percent of the 1,942,800 YPL shares issued and outstanding, and petitioners (the former YPI shareholders who were "U.S. shareholders") would own 52.6 percent of the YPL shares. After the second step, the former YPI shareholders would own between 55.8 percent and 67.3 percent of YPL, and petitioners would own between 34.8 percent and 41.9 percent of the YPL shares.[7]

On February 3, 1981, in order to accomplish their stated business purpose, petitioners effected the proposed transaction with the sale of 1 million shares of YPL on the Alberta Stock Exchange (ASE) for $2.60 (Canada) per share. After completion of the transaction, the former YPI shareholders owned 55.8 percent of the YPL shares, and petitioners owned 34.8 percent. As of the date of the transaction, petitioners held three of the six positions on the YPL board of directors and held the offices of president, chairman of the board, vice president, chief financial officer, and secretary/treasurer of YPL. All of the former YPI shareholders then held four YPL positions. The directors and senior officers of YPL together held options to purchase a total of 175,000 additional common shares of YPL.

YPL and YPI represented to respondent that petitioners had no intention of disposing of their stock in YPL, and that YPL had no intention of disposing of its YPI stock or to liquidate YPI or otherwise to have YPI or YPL abandon the oil and gas business. Petitioners' transfer of their YPL shares would require, pursuant to a legend inscribed on their YPL share certificates in accordance with Alberta law, (1) filing a prospectus with the Alberta Securities Exchange Commission (ASC), or (2) filing a statement of material facts with the ASC and ASE, or (3) obtaining an order from the ASC, or (4) following Canadian procedures for a transfer pursuant to a consolidation, amalgamation, merger, or reorganization. Under Canadian law, the last of these would require approval of three-

---

[7]Upon incorporation of YPL on Jan. 28, 1980, each YPI shareholder was issued 1 share of YPL stock. On Mar. 10 of that year, 20,000 shares of YPL stock were issued to each of 16 Canadian corporations and individuals, one of whom, Albert D. Friesen, was also a YPI shareholder. Apparently, YPL issued 1,622,792 new shares to engage in the exchange, giving the YPI shareholders 1,642,800 shares of YPL and giving petitioners 1,022,800 of the YPL shares. After the sale to the public of 500,000 or 1 million shares, there would be issued and outstanding 2,442,800 or 2,942,800 shares of YPL. The eight YPI shareholders would own 1,642,800 shares, petitioners would own 1,022,800 shares.

fourths of the YPL shareholders, disclosure to the ASE, and acceptance by the ASE. A transfer by YPL of all of its YPI shares would, under Canadian law, require approval by the board, majority shareholder approval, and acceptance for filing of a notice to the ASE.

Petitioners requested a ruling from respondent on the proposed transaction on July 15, 1980. Respondent issued an initial adverse ruling letter with respect to the transaction on February 27, 1981.[8] In their protest[9] to this ruling, dated April 11, 1981, petitioners offered to enter into a closing agreement with respondent "whereby [petitioners] would recognize any inherent gain not recognized under any other provisions of the Internal Revenue Code if at any time prior to January 1, 1985, YPL should dispose of any YPI stock." On June 3, 1982, respondent issued a final adverse ruling on the transaction and declined to enter the proposed closing agreement.[10]

Section 367[11] provides that for certain exchanges and reorganizations in which property is transferred by a U.S. person to a foreign corporation, the corporation will not be considered to be a "corporation" for tax purposes unless the taxpayer establishes to respondent's satisfaction that the exchange is not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes. Because corporate status is essential to nonrecognition treatment under sections 351 and 368(a)(1), section 367 requires that taxpayers obtain a favorable ruling in order to qualify incorporations and reorganizations involving transfers to foreign corporations for nonrecognition treatment. The present case falls within the requirements of section 367 due to the

---

[8]See Private Letter Ruling 8121093 (Feb. 27, 1981).

[9]See Rev. Proc. 77–5, sec. 4.01, 1977–1 C.B. 536, 538, currently updated by Rev. Proc. 84–1, sec. 9.22, 1984–1 C.B. 342, 350.

[10]See Private Letter Ruling 8235071 (June 3, 1982).

[11]For the years in issue, sec. 367 states, in relevant part:

If, in connection with any exchange described in section 332, 351, 354, 355, 356, or 361, there is a transfer of property (other than stock or securities of a foreign corporation which is a party to the exchange or a party to the reorganization) by a United States person to a foreign corporation, for purposes of determining the extent to which gain shall be recognized on such transfer, a foreign corporation shall not be considered to be a corporation unless, pursuant to a request filed not later than the close of the 183d day after the beginning of such transfer (and filed in such form and manner as may be prescribed by regulations by the Secretary), it is established to the satisfaction of the Secretary that such exchange is not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes.

coverage of petitioners' two-step transaction by section 351.[12]

Section 367 initially appeared in the Code as section 112(k) of the Revenue Act of 1932, Pub. L. 72–154, 47 Stat. 169. Congress' purpose in enacting section 112(k) was to close a "serious loophole" in existing tax law that allowed taxpayers to avoid taxation of the capital gain on the sale of appreciated securities by transferring the securities to corporations "organized in countries imposing no tax upon the sale of capital assets." S. Rept. 665, 72d Cong., 1st Sess. (1932), 1939–1 C.B. (Part 2) 496, 515 (hereinafter cited as 1932 Senate Report); H. Rept. 708, 72d Cong., 1st Sess. (1932), 1939–1 C.B. (Part 2) 457, 471 (hereinafter cited as 1932 House Report). Until 1976, the core substantive concept in section 112(k) (and later section 367)—whether the transaction in question was "in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes"—remained unchanged. See Aidinoff & Mosley, "Section 367(a)—Janus Revisited," 36 Tax Law. 629, 630 (1983).

In 1968, in order to make clear the circumstances under which an advance ruling would be granted under section 367, the Service published detailed guidelines describing when a favorable ruling would or would not ordinarily be issued. Rev. Proc. 68–23, 1968–1 C.B. 821 (the Guidelines). For purposes of this case, the relevant general rule is that "a favorable ruling under section 367 of the Code will not be issued for an exchange described in section 351 of the Code where the property to be transferred to the foreign corporation is * * * stock or securities." Guidelines, sec. 3.02(1)(a)(iii). However, respondent recognized in another section of the Guidelines, section 3.03(1)(d), a specific exception to the general rule in section 3.02(1)(a). This exception provides that a favorable ruling will ordinarily be given—

Where the stock of a domestic corporation is acquired in exchange for stock of a foreign corporation and immediately after the exchange the shareholders of the acquired domestic corporation do not own directly or indirectly, within the meaning of section 958 of the Code, more than 50 percent of the total combined voting power of all classes of stock entitled to vote of the acquiring foreign corporation, unless the assets of the acquired domestic

---

[12]Respondent does not contend that the exchange involved herein fails to qualify for nonrecognition under sec. 351, if the requirements of sec. 367 are met. See Rev. Rul. 78–294, 1978–2 C.B. 141.

corporation consist principally of stock or securities. [Guidelines, sec. 3.03(1)(d).]

Notwithstanding the foregoing specific rules, Guidelines section 2.02 sets forth an overall test as follows:

In reviewing each request for ruling to determine whether a favorable section 367 ruling should be issued under the guidelines, the Service reserves the right to issue an adverse ruling if, *based on all the facts and circumstances of a case*, it is determined that the taxpayer has not established that tax avoidance is not one of the principal purposes of the transaction. Similarly, a taxpayer shall be free to establish that based on all the facts and circumstances of the taxpayer's case a favorable ruling under section 367 of the Code should be issued, notwithstanding a contrary statement or implication contained in the guidelines. [Emphasis added.]

Thus, under the Guidelines, failure to fit a transaction within a specific guideline is not necessarily fatal on the question of principal purpose. See *Kaiser Aluminum & Chemical Corp. v. Commissioner*, 76 T.C. 325, 343–344 (1981); *Dittler Bros., Inc. v. Commissioner*, 72 T.C. 896, 913 (1979), affd. without published opinion 642 F.2d 1211 (5th Cir. 1981).[13]

In 1976, as part of the Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1520, Congress restructured section 367 and provided for declaratory judgment jurisdiction of this Court to give taxpayers a forum in which to protest respondent's adverse rulings under that section. The restructuring did not change the "principal purposes" language carried forward from section 112(k), and it is this portion of the statute that is essentially at issue in the present case.[14] Petitioners contend that, because the transaction fits within the mold of Guidelines section 3.03(1)(d), and the facts and circumstances indicate that business reasons primarily motivated the transaction,[15] respondent's conclusion that tax avoidance was one of the principal purposes of the transaction in issue is not supported by substantial evidence. Further, petitioners argue

---

[13]See also Private Letter Ruling 8420032 (Feb. 10, 1984), where respondent applied this overriding guideline in favor of the taxpayer.

[14]We note that the Tax Reform Act of 1984, Pub. L. 98–369, 98 Stat. 494, significantly changed sec. 367 and repealed sec. 7477 respecting transfers after Dec. 31, 1984. These amendments have no bearing on the transaction here in question.

[15]In the ruling request and subsequent material submitted to respondent, representations were made that business purpose was "overriding" and that the "sole purpose" of the proposed transaction was to raise capital. We do not consider that we are bound by these representations which, after all, deal with the ultimate conclusion upon which a decision in this case rests.

that respondent's refusal to enter into an appropriate agreement demonstrates the unreasonableness of respondent's ruling.

Respondent, claiming that the appropriate standard of review is whether his determination was arbitrary and capricious, asserts that section 3.03(1)(d) does not cover this transaction, that the purpose for the transaction was deferral and avoidance of U.S. tax, and that the facts and circumstances thus indicate that respondent's ruling is reasonable.

Section 7477(a)(2), as noted above, requires this Court to declare, inter alia, "whether or not [respondent's] determination is reasonable." In the three cases decided by this Court to date under section 7477, we have consistently held that the proper standard of review under this statute is the "substantial evidence" standard. See *Kaiser Aluminum & Chemical Corp. v. Commissioner, supra* at 343; *Hershey Foods Corp. v. Commissioner,* 76 T.C. 312, 317 n. 7 (1981); *Dittler Bros., Inc. v. Commissioner, supra* at 909–910. Respondent argues that the "mood" of Congress, as expressed in the enactment of sections 112(k), 367, and 7477, indicates that we are to give respondent almost unlimited discretion in ruling on section 367 transactions. We do not agree. As we held in *Dittler Bros.,* by directing the Court to determine the reasonableness of respondent's section 367 determinations, Congress, in 1976, withdrew the unbridled discretion that respondent perhaps was once given.[16] The proper test, falling "somewhere between the arbitrary and capricious test and a simple redetermination" (72 T.C. at 910), is the substantial evidence test, under which we are to determine whether respondent's ruling is supported by " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " 72 T.C. at 909 (citation omitted). We reject respondent's plea that we reconsider our prior decisions, abandon the "substantial evidence" test, and

---

[16]See H. Rept. 94–658 (1975), 1976–3 C.B. (Vol. 2) 695, 933; S. Rept. 94–938 (1976), 1976–3 C.B. (Vol. 3) 49, 301, in which the Committees cite as problems with the pre-1976 law that "the statute requires the Commissioner's not the Court's satisfaction" and that "since the law requires the satisfaction of the Commissioner, a taxpayer is unable to go through with a transaction and litigate in the courts the question of whether tax avoidance is one of the purposes of the transactions." See also *Gerli v. Commissioner,* 668 F.2d 691, 696, 698 (2d Cir. 1982), revg. on another ground 73 T.C. 1019 (1980). ("The Committee reports on the 1976 Act expressed an intent to limit, at least prospectively, the discretion of the Commissioner," and, with respect to pre-1976 transactions, "the Secretary's discretion was surely not intended to be limitless.")

adopt an "arbitrary and capricious" test.[17]

After a careful review of the entire administrative record, we conclude that respondent's determination that one of petitioners' principal purposes was the avoidance of Federal income taxes is not supported by substantial evidence, and is thus unreasonable.

Our analysis begins with the Guidelines, which were followed by respondent at the time of his adverse determination regarding petitioners' transaction. See Rev. Proc. 77–5, sec. 3.03, 1977–1 C.B. 536, 538. Petitioners argue that, because their transaction fits section 3.03(1)(d) of the Guidelines as they interpret it, upholding respondent's ruling would constitute subversion of their reasonable reliance on the Guidelines in structuring their affairs. Respondent claims that, because the transaction is covered by section 3.02(1)(a) of the Guidelines as he interprets it, the unfavorable ruling is reasonable. In interpreting the Guideline provisions, both parties expend much effort arguing whether "the shareholders of the acquired domestic corporation," i.e., the group under section 3.03(1)(d) that must own 50 percent or less of the acquiring foreign corporation immediately after the exchange, encompasses only the U.S. shareholders of YPI (petitioners) or all the former shareholders of YPI. Moreover, the parties are in dispute over whether the control test in section 3.03(1)(d) includes a determination of "effective, practical control" where the 50-percent control test is not met. Although these issues are interesting, they are subsidiary to the basic issue in this and other cases under section 367, namely, whether the transaction had, as one of its principal purposes, tax avoidance. In light of our conclusion on that issue, we do not reach the "shareholder" definition issue or the issue of "effective, practical control" posed by the parties.

The Guidelines are not positive law, but were promulgated to give taxpayers guidance regarding respondent's ruling policy under the statutory "principal purposes" standard (*Dittler Bros., Inc. v. Commissioner*, 72 T.C. at 914)—a standard never elucidated by Congress or by respondent, see Himmel, "The Section 367 Toll-Charge Requirement: Impact of the *Gerli* Case," 8 International Tax J. 276, 284 (1982).

---

[17]See discussion as to the semantic problems involved in applying the two tests in *Dittler Bros., Inc. v. Commissioner*, 72 T.C. 896, 929–931 (1979) (Tannenwald, J., dissenting).

Although Congress, as respondent maintains, did generally approve of the Guidelines in 1976, it clearly indicated that declaratory judgment relief for taxpayers issued adverse rulings under section 367 was necessary because "there may be cases where these standards are inappropriate or are not being correctly applied." H. Rept. 94–658 (1975), 1976–3 C.B. (Vol. 2) 695, 933; S. Rept. 94–938 (1976), 1976–3 C.B. (Vol. 3) 49, 301. Hereinafter cited as 1975 House Report and 1976 Senate Report. It is section 367, itself, and not the specific Guidelines provisions, that is the positive law which respondent must follow in issuing rulings; the Guidelines serve only to implement the principal purposes test in section 367.[18] Indeed, the Guidelines, themselves, reflect this fact in section 2.02 (see *supra* p. 91), which overrides the application of specific provisions of the Guidelines by allowing either the Service or a taxpayer to argue principal purposes from all the facts and circumstances. Accordingly, this Court has consistently rejected a rigid, mechanical application of the Guidelines. *Kaiser Aluminum & Chemical Corp. v. Commissioner, supra* at 343–344, 346–347; *Dittler Bros., Inc. v. Commissioner, supra* at 912–914; see generally Johnson, "A Criticism of the Internal Revenue Service Standards Used in Evaluating Section 367(a)(1) Ruling Requests," 61 Taxes 749, 752–753 (1983).[19]

Thus, we direct our attention not to whether petitioners' transaction fits the detailed requirements for a favorable ruling under Guidelines section 3.03(1)(d), but, instead, to whether, given all the facts and circumstances disclosed in the administrative record, respondent's determination that the transaction had tax avoidance as one of its principal purposes is supported by substantial evidence.

As we held in *Dittler Bros., Inc. v. Commissioner, supra,* the proper test for whether tax avoidance was a principal purpose is not, as respondent urges, whether a tax-avoidance purpose "figures prominently as a reason for the plan," or whether

---

[18]See H. Rept. 98–432 (Part 2) 1308 (1984) (outlining present law in the context of 1984 revisions to sec. 367).

[19]Respondent again maintains that the Guidelines create a presumption of tax avoidance and require an automatic decision by this Court in his favor where the only exchange is stock of a domestic corporation for stock of a foreign corporation and, but for sec. 367, sec. 351 would apply. In his zealousness, respondent purports to quote sec. 2.02 of the Guidelines and grudgingly admits that petitioners may "overcome the burden of this presumption." In point of fact, the quoted language does not appear in sec. 2.02.

business reasons are "so overwhelming as to make tax avoidance a negligible concern," but, rather, whether the transaction had "as one of its 'first-in-importance' purposes the avoidance of Federal income taxes." 72 T.C. at 915.

Respondent argues that petitioners' transaction was precisely the type which Congress had in mind when it enacted section 367—"the classic avoidance transaction." Acknowledging that the "concept of tax avoidance is not always an easy one to grasp or define," respondent finds tax avoidance in the fact that YPL could have sold its appreciated YPI stock free of U.S. tax at any time before the date on which section 897[20] overrides the treaty between the United States and Canada exempting the gain from tax,[21] and thus avoided U.S. income tax on the appreciation accruing in YPI. According to respondent, petitioners' business purpose arguments are "weak" in light of what he claims to be substantial evidence of tax avoidance and petitioners' effective control of YPL—the instrument through which the tax on YPI's appreciation could be avoided. Pointing to the fact that the delayed effective date of section 897 gives the *foreign* YPL shareholders an incentive to avoid taxes causing the YPI shares to be sold quickly, respondent concludes that "the facts here do not lead one to an inevitable conclusion that tax avoidance played an immaterial role."

Petitioners, citing the "first in importance" standard, claim that they adequately demonstrated that business, not tax, considerations dominated their thinking. They point to the need for capital, the relative efficiency and effectiveness of a Canadian public offering to obtain the capital, the need to form YPL in order to make the offered shares marketable, and

---

[20]Sec. 897 imposes a tax on dispositions by nonresident aliens and foreign corporations of a "United States real property interest." The parties apparently agree that the YPI stock represents such an interest.

[21]The current treaty was signed on Sept. 26, 1980, amended by protocols signed June 14, 1983, and Mar. 28, 1984, and ratified on Aug. 16, 1984. The effective date provision of sec. 897 states that treaties cease to override sec. 897 as of Dec. 31, 1984, unless a treaty is renegotiated to resolve problems of conflict with sec. 897, and signed between Jan. 1, 1981, and Jan. 1, 1985. In that case, the date specified in the new treaty (not later than 2 years after the treaty was signed) is to be substituted for the Dec. 31, 1984, override date. Although the parties at one point agreed that sec. 897 would take precedence over the treaty with Canada beginning Jan. 1, 1985, there now appears to be a dispute on this issue. Petitioners contend that the override date is Aug. 16, 1984, the ratification date, while respondent argues that, because of a treaty provision, sec. 897 will not override the treaty until Jan. 1, 1986. Our disposition of the issue of tax-avoidance purpose makes it unnecessary to decide on what date the treaty will actually be overridden; thus, we leave this decision to another day.

the restrictions on the sale of the YPI shares by YPL. Noting that they remain willing to agree to recognize any inherent gain not otherwise recognized on the sale of the YPI shares, petitioners conclude that respondent's determination ignores "both a business purpose for the transaction and a lack of interest on the part of Petitioners to avoid tax."

We agree with petitioners. Respondent's argument that one of the principal purposes here was tax avoidance really breaks down into two parts—that there was a *potential* for tax avoidance inherent in the transaction, and that taxes were *deferred* as a consequence of the transaction. Respondent argues that potential avoidance was within the scope of Congress' aim in passing the predecessor to section 367. Describing an example of the kind of transaction to be covered by section 112(k), the committee reports stated—

For example, A, an American citizen, owns 100,000 shares of stock in Corporation X, a domestic corporation, which originally cost him $1,000,000 but now has a market value of $10,000,000. Instead of selling the stock outright A organizes a corporation under the laws of Canada to which he transfers the 100,000 shares of stock in exchange for the entire capital stock of the Canadian company. This transaction is a nontaxable exchange. The Canadian corporation sells the stock of Corporation X for $10,000,000 in cash. The latter transaction is exempt from tax under the Canadian law and is not taxable as United States income under the present law. The Canadian corporation organizes Corporation Y under the laws of the United States and transfers the $10,000,000 cash received upon the sale of Corporation X's stock in exchange for the entire capital stock of Y. The Canadian corporation then distributes the stock of Y to A in connection with a reorganization. By this series of transactions, A has had the stock of X converted into cash and now has it in complete control. [1932 Senate Report, *supra,* 1939–1 C.B. (Part 2) at 515; 1932 House Report, *supra,* 1939–1 C.B. (Part 2) at 471.]

Respondent argues that regardless of the fact that, in this example, the appreciation in the value of the X stock, represented by corporation Y's cash, will be taxed if and when there is an eventual distribution to A, Congress enacted the predecessor to section 367 so as to attack the *potential* avoidance resulting from A's control over the distribution. This Court has applied this rationale and held that a potential for tax avoidance "should be an element to be considered" in determining whether a tax-avoidance purpose pervaded the transaction. *Dittler Bros., Inc. v. Commissioner,* 72 T.C. 896, 917 (1979), affd. without published opinion 642 F.2d 1211 (5th

Cir. 1981); cf. *Hershey Foods Corp. v. Commissioner*, 76 T.C. 312, 318 (1981) (if no tax-avoidance potential exists, tax avoidance cannot be a principal purpose).

However, Congress has also stated that this potential, *alone*, is not enough. Enumerating the problems with the pre-1976 enforcement of section 367, the committee reports mention as an area of difficulty "situations where the IRS requires a U.S. shareholder to include certain amounts in income as a toll charge even though there is no present tax-avoidance purpose but, rather, only the existence of a potential for future tax avoidance." 1975 House Report, *supra*, 1976–3 C.B. (Vol. 2) at 932; 1976 Senate Report, *supra*, 1976–3 C.B. (Vol. 3) at 301.[22] A potential for avoidance, then, is not dispositive, but is only one of the "facts and circumstances" to be considered, and the actual likelihood of the future actions that will result in avoidance is highly relevant. See *Kaiser Aluminum & Chemical Corp. v. Commissioner*, 76 T.C. 325, 347 (1981).[23] The example given in the 1932 House Report, *supra*, and 1932 Senate Report, *supra*, is devoid of any reference to business purpose, which has always been a critical element in finding the proscribed purpose contained in section 367. We reject respondent's attempt to persuade us to convert a distinguishable example in a legislative committee report into a mandate which establishes an inflexible rule—a status not even adopted by respondent in his own Guidelines.

In the instant case, future tax avoidance could result only if YPL sells its YPI shares before the date on which section 897 becomes effective.[24] There is indeed a potential for avoidance

---

[22]Even the 1932 House Report and 1932 Senate Report, cited at p. 90 *supra*, inferred that not all transactions of the type of the example given, would be tainted by a tax-avoidance purpose ("while it is probable that the courts will not hold all transactions of this nature to be tax-free exchanges").

[23]Indeed, if potential avoidance were intended to be enough, Congress could simply have denied corporate status in cases in which appreciated property is transferred outside the country, and not permitted a taxpayer to show that tax avoidance was not a principal purpose of the transfer. In this connection, we recognize that the Tax Reform Act of 1984 appears to make an exchange, such as involved herein, taxable, but that act is not applicable herein (see *supra* note 14) and respondent has not argued otherwise.

[24]See *supra* note 21. A sale by petitioners of their YPL shares does not seem to have the potential to avoid taxes, as petitioners' ruling request asks for a basis in the YPL shares equal to the basis in the transferred YPI shares. See sec. 358(a).

Respondent argues that petitioners could avoid taxes even after the override date by changing the structure and asset mix of YPI and thus avoiding the tax under sec. 897. Suffice it to say that the definitions under sec. 897 are difficult enough so that we are unimpressed by respondent's crystal-ball argument. See Feder & Parker, "The Foreign Investment in Real Property Tax Act of 1980," 34 Tax Law. 545, 555–558 (1981).

of U.S. taxes on the appreciation in YPI if this occurs. The question, however, is whether substantial evidence supports respondent's determination that, on *all* the facts and circumstances, tax avoidance was a principal purpose of this transaction.

YPI clearly needed capital in order to continue profitable operations, and the management of YPI decided that a public offering was the optimal approach. A foreign offering avoided the time and money involved with the SEC registration needed for a domestic offering. Management chose Canada due to prior dealings with Canadian investors, geographic proximity, and a favorable market outlook. YPL was formed to avoid marketability problems which, due to SEC restrictions, would accompany a U.S. offering or, indeed, a Canadian offering, of YPI stock. These restrictions would not only have been imposed on the subsequent transfers of YPI stock offered to the public, but would have operated directly on the offering of the shares, themselves. They appear to be far more onerous than those involved in the YPL offering, where the restrictions seem to have been imposed only on the subsequent transfers of the YPL shares in the hands of former YPI shareholders. If the restrictions accompanying the Canadian offering had not been less onerous, it would seem that the Canadian underwriter and transfer agent would have been as unwilling to undertake an offering of YPL shares as they were in respect of an offering of YPI shares in Canada. Finally, we think it significant that the initial plan was to offer YPI shares, in which case section 367 would have had no relevance. It was only after the SEC voiced its concern, and after the restrictions proposed to be attached to the offering of YPI shares were found to be unacceptable by the Canadian underwriter and transfer agent, that the decision to offer shares of YPL was made and section 367 came into play.[25]

We are unimpressed by respondent's argument that petitioners, because of their board positions and offices and their options to purchase YPL stock, had practical control of YPL sufficient to enable them to force a tax-avoiding sale of YPI shares, and that the grace period effected by section 897 would

---

[25]We think this timing factor gives credence to the representation in the administrative record that the exchange in question had solely a business, and not a tax-avoidance, purpose. See *supra* note 15.

give the Canadian YPL shareholders a motive to see YPI sold prior to the override date in order to avoid a U.S. tax. We think respondent is grasping at straws in an effort to persuade us to hold that tax avoidance was one of the principal purposes of the exchange involved herein. The fact of the matter is that the petitioners are four unrelated persons. Their common interest was to stay in the oil and gas business, an interest which would have been subverted, if not defeated, by a sale of the YPI shares. As far as the Canadian shareholders of YPL were concerned, any tangential incentive to avoid a future U.S. tax was clearly subordinated to the necessity of compliance with the restrictions imposed by Canadian law on the sale of the YPI shares by YPL. Moreover, any doubts relating to the significance of any tax-avoidance purpose during the section 897 grace period[26] are further minimized by the offer of a closing agreement by petitioners—a matter to which we now turn our attention in connection with respondent's attempt to equate deferral of tax with avoidance of tax.

Respondent argues that the deferral component of petitioners' transaction warrants his adverse determination. As respondent puts it, "In modern tax parlance, a tax deferred is a tax saved." In fact, given petitioners' willingness to enter into a closing agreement to recognize any inherent gain on an eventual sale of the YPI shares not otherwise recognized prior to the expiration of the grace period,[27] it would seem that it is only the deferral of taxation that respondent can be arguing as the present tax avoidance in this case.[28] The problem, however, with equating deferral with section 367 avoidance is that every transaction that qualifies for a section 367 ruling request is a nonrecognition transaction. By definition, income

---

[26]In light of our decision that the sec. 897 argument must fail due to petitioners' substantial business purpose, we need not decide the claim by petitioners that respondent has the burden of proof as to this alleged "new matter." We note, however, that the transaction in issue added no incremental incentive to disinvest to that which already existed for the Canadian shareholders. Sec. 897 will require recognition of gains and losses by both foreign corporations and nonresident aliens after the override date.

[27]In this connection, we note that at the time the closing agreement was offered, petitioners considered that the grace period expired on Dec. 31, 1984, a position with which the respondent agreed. See *supra* note 21.

[28]In other words, when taxpayers set up a transaction under which there is a possibility that tax on the gain represented by shares of stock will be escaped entirely, this can be characterized as potential tax avoidance. However, when those taxpayers agree to recognize this gain to the extent it remains unrecognized upon the disposition of the shares, the only issue is the deferral of payment of the tax.

tax is deferred when a transaction qualifies as a nonrecognition incorporation, reorganization, or liquidation, until the stock or assets involved are transferred in a recognition transaction. Thus, if deferral alone were enough, there could never be a favorable ruling under section 367—a result that Congress obviously did not intend. See generally Aidinoff & Mosley, "Section 367(a)—Janus Revisited," 36 Tax Law. 629, 640, 655 (1983).[29] Certainly, the Commissioner has a legitimate interest in taxpayers' deferrals of taxes (see Sitrick, "Section 367 and Tax Avoidance: An Analysis of the Section 367 Guidelines," 25 Tax L. Rev. 429, 432 (1970)), but deferral, alone, cannot be equated with avoidance under section 367.

Respondent's all-or-nothing approach to proposed closing agreements—noted in *Kaiser Aluminum & Chemical Corp. v. Commissioner,* 76 T.C. 325, 349–351 (1981), and apparently still followed today (see H. Rept. 98–432 (Part 2) 1311 (1984); 61 J. Taxation 268, 269 (1984))—is no less unreasonable on the facts of the instant case than it was in *Kaiser Aluminum.* Where adoption of a proposed closing agreement would reduce the tax-avoidance possibilities to the level of those that would exist in any *domestic* incorporation transaction (i.e., deferral), respondent's refusal to enter the agreement or even to negotiate it is an element that ought to be considered in determining the reasonableness of his determination that avoidance of Federal income taxes was one of the principal purposes of the transaction. In light of Congress' approval in 1976 of a standard that permits nonrecognition treatment of transfers of liquid or passive investment assets outside the United States when the tax on the potential earnings from these assets "is paid *or is preserved for future payment*" (1975 House Report, *supra,* 1976–3 C.B. (Vol. 2) at 932; 1976 Senate Report, *supra,* 1976–3 C.B. (Vol. 3) at 300 (emphasis added); see also H. Rept. 98–432 (Part 2), *supra* at 1316 (generally reapproving this standard)), respondent's arguments about the enforceability and allegedly undue flexibility of closing agreements are simply unpersuasive. See *Kaiser Aluminum & Chemical Corp. v. Commissioner, supra* at 349–350. Indeed, we note that the policing difficulties

---

[29]Another way to understand this point is that sec. 367 was enacted to restrict only the incremental tax avoidance possible due to the limits of the U.S. taxing jurisdiction. Decisions about deferring taxes when assets are incorporated—in this country or abroad—were made in enacting sec. 351.

to which respondent points in connection with the proposed closing agreement with respect to a transfer of YPI stock by YPL taking place before the override date seem to be no different from those which will exist after the grace period contained in section 897 expires.[30]

Because the administrative record fails to disclose substantial evidence of a principal purpose of tax avoidance, either in the way of potential avoidance or tax deferral, we conclude that respondent's adverse determination is unreasonable within the meaning of section 7477(a)(2)(A) and that YPL will thus qualify for corporate status under section 367.

*An appropriate decision will be entered.*

---

[30]For possible monitoring provisions which might be in a closing agreement, see Aidinoff & Mosley, "Section 367(a)—Janus Revisited," 36 Tax Law. 629, 648 & n. 91 (1983). In light of the dispute as to the expiration date of the grace period (see *supra* note 21), and our reluctance independently to articulate terms and conditions (*Dittler Bros., Inc. v. Commissioner,* 72 T.C. 896, 919–920 (1979), affd. without published opinion 642 F.2d 1211 (5th Cir. 1981)), we think it would be inappropriate to require petitioners to implement their offer of a closing agreement. Cf. *Hershey Foods Corp. v. Commissioner,* 76 T.C. 312, 324–325 (1981).