BETTY MAYLAND ELLIS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ellis v. Commissioner
Docket No. 24592-83T.
United States Tax Court
T.C. Memo 1985-511; 1985 Tax Ct. Memo LEXIS 112; 50 T.C.M. (CCH) 1202; T.C.M. (RIA) 85511; September 30, 1985. Stuart E. Seigel,Fairlea A. Sheehy, and Stanley I. Langbein, for the petitioner. Robert P. Ruwe,Alfred C. Bishop, Jr., and Paul S. Horn, for the respondent. TANNENWALD
MEMORANDUM OPINION TANNENWALD, Judge: Respondent determined that petitioner's proposed transfer of certain agricultural properties located in Alberta, Canada (the "farmlands") to a Canadian corporation is "in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes, *115 " within the meaning of section 367, [1] and that the transfer thus fails to qualify for nonrecognition treatment under section 351. Having met all jurisdictional prerequisites, see sec. 7477(b), petitioner timely filed her petition for a declaratory judgment pursuant to section 7477(a). The issue for decision is whether respondent's determination is reasonable. The case was submitted for decision on the stipulated administrative record under Rule 122. This reference incorporates the administrative record herein. For purposes of this proceeding, we will assume "that the facts as represented in the administrative record as so stipulated * * * are true." Rule 217(b). At the time she filed her petition in this case, petitioner, a Canadian citizen, resided in Gloucester, Massachusetts. The farmlands consist of approximately 3,300 acres of land, comprising seven separate farms, located south of Calgary, Alberta. [2] All but approximately 640 acres *116 of the farmlands were acquired by petitioner about 25 years age by inheritance from her father, the balance being acquired about 10 years ago. At the time of petitioner's ruling request, the farmlands had an estimated fair market value of $5,300,000 (Canadian) and a United States tax basis of $283,403. Prior to 1981, petitioner had annual sharecropping agreements with the tenant farmers who worked the farmlands. Under these agreements, the tenant farmers were responsible for planting, raising, and harvesting the crops, and provided all the labor, materials, and tools necessary therefor. Petitioner received one third of the proceeds from sales of the crops, paid all real property taxes, was responsible for the maintenance and insurance of the farm buildings, and paid for one third of the fertilizer. Over the years 1976-80, petitioner's total expenditures (in U.S. dollars) with respect to the farmlands were as follows: Insurance
$5,800
Maintenance
3,400
Spray & Fertilizer
4,600
Property Taxes
39,100
Management Fee
4,600
Storage
1,200
Water Installation
2,600
Gas Installation
700
Miscellaneous
1,900
*117 Together with Warren Cooper, an experienced Alberta farmer, petitioner made all managerial decisions concerning the farmlands, including which crops would be planted, where they would be planted, how they would be fertilized, and which land would remain fallow. With Mr. Cooper's advice, petitioner selected, and entered into sharecropping agreements with, the tenant farmers, and directed their activities with respect to crop rotation, fertilizing, planting, and similar matters relating to the farmlands. The tenant farmers accounted to petitioner for the operation of the farms, the accounts were reviewed by petitioner and Mr. Cooper, and petitioner maintained her own books and records for the farms. Petitioner paid Mr. Cooper a fee not exceeding $1,000 (Canadian) per year for his services. During the years 1976-80, petitioner's income (in U.S. dollars) from operation of the farmlands was as follows: 1976
1977
1978
1979
1980
Gross income
$62,900
$39,100
$24,00
$109,500
$51,600
Net income
42,200
24,900
4,400
92,000
40,200
In 1981, on advice of counsel, petitioner converted her arrangements with the tenant farmers to leasing arrangements. *118 The term of the leases was one year and from year to year thereafter unless either party gave six months notice of termination at the end of the year. Under the leases, petitioner receives a fixed yearly cash rental payment; petitioner is responsible for the payment of real property taxes and insurance premiums with respect to the farmlands; and the tenant farmers are responsible for the maintenance and repair of the farm buildings and fences, payment of all utilities, and the management of the farmlands "in a proper husbandmanlike manner." Otherwise, the farmlands are operated substantially as they were under the sharecropping arrangement. Contemplating the instant transfer, petitioner made this change because, under article VIII of the United States-Canada tax treaty then in effect (the "Treaty"), capital gains realized in Canada by a resident of the United States are exempt from taxation in Canada unless the United States resident has a "permanent establishment" in Canada. United States-Canada Income Tax Convention, Mar. 4, 1942, art. VIII, 56 Stat. 1402, T.S. No. 983, as supplemented. Under the sharecropping arrangement, petitioner was deemed to have a permanent establishment *119 in Canada; however, the Canadian tax authority issued a ruling to petitioner dated April 29, 1981 to the effect that the leasing arrangement does not give petitioner a permanent establishment in Canada. On the strength of this ruling, petitioner transferred other Canadian properties to a United States corporation without incurring Canadian capital gains tax. If petitioner were directly to own the farmlands at the time of her death, the Canadian Income Tax Act ("Canada Act") would impose a transfer tax on one half of the gain resulting from a deemed transfer of the farmlands for their fair market value on the date of her death. Canada Act, sec. 70(5); see Estate of Ballard v. Commissioner,85 T.C. 300, 305 (1985). If, during her life, petitioner were to transfer the farmlands to a corporation, however, (1) the gain on the inter vivos transfer itself would, pursuant to the Treaty, be exempt from Canadian tax (i.e., because petitioner has no permanent establishment in Canada), and (2) there would be no transfer tax payable on petitioner's death because she would, at the time of the original transfer, receive a Canadian tax basis in her shares stepped up to fair market *120 value. [3] While a transfer of the farmlands to a United States corporation would also accomplish this Canadian tax advantage, the law of Alberta does not permit the transfer of land such as the farmlands to corporations incorporated outside Canada. Agricultural & Recreational Land Ownership Act, Ch. A-9, sec. 2; Foreign Ownership of Land Regulations, sec. 4(1). For the relevant years, the Canadian income tax rate for corporations is 46 percent, and a progressive rate schedule *121 for individuals applies, ranging up to a 34-percent rate on income over $53,376. For nonresidents of Canada, however, income on Canadian investments is generally taxed at 25 percent. Canada Act, sec. 212. The Treaty, which overrides the Canada Act (see Canada Act, sec. 10(6)), applies a maximum rate of 15 percent on the Canadian investment income of United States residents having no permanent establishment in Canada. Treaty, art. XI, par. 1. Petitioner requested a ruling on September 28, 1981 with respect to a proposed transfer of the farmlands to Mayland Farms, Ltd. ("Mayland Farms"), a Canadian corporation, solely in exchange for all the common stock of Mayland Farms. In that request, petitioner represented to respondent that Mayland Farms will not dispose of any of the farmlands, that she does not intend to dispose of any of the shares of Mayland Farms, and that she will revert to the sharecropping arrangement with the tenant farmers irrespective of respondent's determination as to the proposed transfer to Mayland Farms. Petitioner also undertook to include in her U.S. income tax return for the year of transfer all remaining income under any unexpired leases. Respondent issued *122 an initial adverse ruling letter with respect to the transaction on October 29, 1982. In her protest to this ruling, dated December 13, 1982, petitioner indicated her willingness to enter into a closing agreement with respondent "whereby she agrees, for the next ten years, to include in income, in any taxable year in which a disposition of the property by [Mayland Farms] occurs, the gain she would recognize currently if the transaction were regarded as a taxable exchange." On May 25, 1983, respondent issued a final adverse ruling on the transaction. Section 367[4] provides that for certain exchanges in which property is transferred by a United States person to a foreign corporation, the latter will be considered to be a "corporation" for tax purposes only if the taxpayer establishes to respondent's satisfaction that the exchange "is not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes." Because corporate status is essential to nonrecognition treatment under section 351 for incorporation transactions, such as that proposed by petitioner *123 herein, section 367 requires that petitioner obtain a favorable ruling in order to qualify her incorporation for nonrecognition treatment. In the event of an unfavorable ruling, section 7477 gives taxpayers in certain situations (see supra note 4) the right to petition this Court for a declaration that respondent's determination is unreasonable. See sec. 7477(a)(2)(A). As we have held each time the issue has been before us, the proper standard of review under section 7477(a) is not, as respondent has consistently urged and again urges herein, whether respondent's determination is arbitrary and capricious, but rather whether such determination is supported by substantial evidence. Pitcher v. Commissioner,84 T.C. 85, 92-93 (1985); Kaiser Aluminum & Chemical Corp. v. Commissioner,76 T.C. 325, 343 (1981); Hershey Foods Corp. v. Commissioner,76 T.C. 312, 317 n.7 (1981); Dittler Brothers, Inc. v. Commissioner,72 T.C. 896, 909-910 (1979), affd. without published opinion 642 F.2d 1211 (5th Cir. 1981). *124 Respondent bases his determination upon his published guidelines as to when favorable rulings under section 367 will ordinarily issue. Rev. Proc. 68-23, 1968-1 C.B. 821 (the "Guidelines"). Thus, according to respondent, because petitioner's proposed transaction does not fit within Guidelines, sec. 3.02(1) and does fit within Guidelines, sec. 3.02(1)(b)(1), a presumption that one of the principal purposes of the planned exchange was Federal income tax avoidance is raised, and, further, the facts and circumstances of petitioner's situation are insufficient to overcome this presumption. Petitioner argues that her transfer is outside the intended scope of section 367, that respondent's guidelines raise no presumptions, and that the facts and circumstances demonstrate that her purpose is Canadian, not United States, tax minimization. We begin by noting that section 367, and not the Guidelines, is the positive law to be applied; the Guidelines serve only to implement the "principal purposes" test in section 367. Pitcher v. Commissioner,supra at 93-94. Mechanical *125 application of the Guidelines has consistently been rejected in favor of an examination of the taxpayer's purposes in light of all the facts and circumstances. See Pitcher v. Commissioner,supra at 91, 94, and authorities cited thereat; Guidelines, sec. 2.02. Thus, we find that the issues, argued strenuously by the parties, of whether the farmlands are "to be devoted by the transferee foreign corporation to the active conduct, in any foreign country, of a trade or business" (Guidelines, sec. 3.02(1)), whether actual employees (as opposed to independent contractors) are necessary to meet such standard, and whether petitioner's current leasing arrangement violates Guidelines, sec. 3.02(1)(b)(ii) are subsidiary to the basic section 367 issue. Cf. Pitcher v. Commissioner,supra at 93. Respondent's conviction that petitioner's alleged failure to meet the technical requirements of the Guidelines raises a presumption that her purpose was to avoid Federal taxes, then, is misguided; petitioner's burden is to demonstrate on all the facts and circumstances that respondent's unfavorable determination is not supported by substantial evidence. See *126 Pitcher v. Commissioner,supra at 94 & n.19. In the foregoing context, we are constrained to note that respondent's emphasis on lack of "business purpose" is beside the point. The issue herein is purpose to avoid United States income tax. The avoidance of Canadian taxes is not such a purpose even though it may also not be a "business purpose" within the usual meaning of that term. To meet her burden, petitioner argues that she has demonstrated that the proposed transfer does not implicate the policy underlying section 367, that her principal purpose in effectuating the transfer is to facilitate Canadian estate planning, that no actual or potential U.S. tax avoidance can possibly result from the transfer, and that her willingness to enter into a closing agreement evinces the unreasonableness of respondent's determination. For the reasons hereinafter stated, we agree that petitioner has shown respondent's ruling to be unreasonable. The U.S. tax avoidance purpose issue has two parts: (1) the taxation of petitioner's income from the operations of the farmlands and (2) the taxation of the gain on the disposition of the farmlands. Income from the Farmlands
*127 Respondent argues that because the proposed transfer will result in actual avoidance of the U.S. tax on the income from the operations of the farmlands, its principal purposes must include U.S. tax avoidance. Under section 901(b)(3), petitioner may credit against her U.S. tax liability the amount of any income taxes paid or accrued during the taxable year to Canada. As noted above, Canada levies a 25-percent tax on the Canadian investment income of nonresidents of Canada. Under the Treaty, however, the income tax imposed by Canada upon the Canadian income of United States residents having no permanent establishment in Canada cannot exceed 15 percent. As a consequence, petitioner now has a reduced Canadian tax on the income from the farm operations (because she has no permanent establishment in Canada) with the result that the U.S. foreign tax credit is now less, and the U.S. tax is now greater, on such income. Thus, respondent contends, if there is no transfer to Mayland Farms, the foreign tax credit generated by the Canadian tax on the income from petitioner's farm operations will be inadequate to eliminate the U.S. tax on such income; [5] consequently, according to respondent, *128 a portion of that larger present U.S. tax on such income will still remain, and would be entirely avoided by a transfer of the farmlands to Mayland Farms, an entity outside the U.S. taxing jurisdiction. Petitioner contends that, because she will revert to the sharecropping arrangement regardless of whether the transfer occurs, the transfer will actually increase the U.S. tax payable on the income from farmlands operations. Because the transfer and reversion to sharecropping will result in Mayland Farms owning the farmlands, and petitioner having no permanent establishment in Canada, the maximum Canadian tax rate on petitioner's Canadian investment income would be 15 percent, a lower Canadian tax rate than would apply to such income if there were no transfer and petitioner were to revert to sharecropping. Thus, according to petitioner, the transfer will result in a lower Canadian tax on her Canadian investment income *129 resulting, in turn, in a higher U.S. tax on such income (i.e., due to the smaller foreign tax credit). Respondent answers that petitioner's argument is based on two unjustifiable assumptions. First, no business exigency has been demonstrated for petitioner's assumption that she will revert to the sharecropping arrangement irrespective of the transfer. Second, petitioner assumes that her other Canadian investment income will remain sufficiently large that the lower Canadian tax rate thereon resulting from the transfer will generate U.S. tax credits relatively small enough to outweight the loss of the U.S. tax on the income from farmlands operations that would, without the transfer, remain after crediting Canadian taxes paid. Respondent contends that the proper inquiry under section 367 does not include a determination of the "collateral tax consequences" as to petitioner's other Canadian investments and Canada's various tax rates. Initially, we note that the picture of actual tax consequences which petitioner seeks to portray is predicated on her representations as to two conditions subsequent, namely her reversion to the sharecropping arrangement and her retention of the present *130 level and general composition of her Canadian investment income. Respondent's argument that we should not automatically accept such representations as true is not without some validity. To be sure, we have on occasion appeared to expand the literal mandate of Rule 217(b) that "the facts as represented in the administrative record * * * are true" to include "representations" as well as "facts." See Dittler Brothers, Inc. v. Commissioner,supra at 897; Note to Rule 217(b), 68 T.C. at 1048. But we doubt that this seeming expansion contemplated bald representations as to future conduct which are unsupported by objective facts. Because that is not the case herein, we have no need to explore the outer limits of the mandate of Rule 217(b). Petitioner adopted the leasing arrangement, after years of sharecropping, for a specific, one-time Canadian tax purpose--i.e., in order that the capital gain from the instant transfer and a transfer of other Canadian property to a United States corporation would be exempt from Canadian tax under the Treaty. This Canadian tax exigency will cease to exist once the transfers are made or rejected. The Treaty has no provision *131 for "recapture" of previously exempt gains tax once a seller reacquires a permanent establishment in Canada; thus, if the two transfers were effectuated, there would be no penalty for thereafter reverting to sharecropping. Likewise, if the plan for the instant transfer were abandoned due to respondent's unfavorable ruling, the purpose for retaining the leasing arrangement would also be gone. Moreover, were the proposed transfer to be completed, petitioner would have no U.S.taxreason to cause Mayland Farms to refrain from reverting to sharecropping: irrespective of which arrangement is chosen, the transfer would result in Mayland Farms, the owner of the farmlands and a Canadian corporation, being taxed at the Canadian corporate rate, and petitioner, a nonresident having no permanent establishment in Canada, being taxed on dividends and her other Canadian investment income at the 15-percent Treaty rate. To expect petitioner of Mayland Farms to retain the leasing arrangement after its purpose has disappeared simply because such retention would hypothetically defeat a U.S. tax [6] is unrealistic in light of petitioner's historical preference for the sharecropping arrangement *132 and the fact that, irrespective of the manner in which petitioner were to deal with the farmlands (lease or sharecropping) her total tax, United States and Canadian, would remain the same. Similarly, respondent's fear that petitioner may liquidate enough of her Canadian investments that respondent's loss of the post-credit U.S. tax on the farmlands income due to the transfer will outweigh petitioner's loss of the foreign tax credits generated by petitioner's Canadian investment income due to the transfer is also unrealistic. After the transfer, petitioner will be liable for a 15-percent Canadian tax on her Canadian investment income, which is creditable against the U.S. tax on such income. While sales of these investments would be exempt from Canadian *133 tax under article VIII of the Treaty, as petitioner would then have no permanent establishment in Canada, the U.S. tax on the gain from such sales would still be imposed, and would be unreduced by a foreign tax credit. Thus, while the liquidation of her Canadian investments would permit petitioner theoretically to avoid offsetting her lost U.S. tax liability on farmlands income with new U.S. tax liability on her Canadian investment income due to the lower Canadian tax rate and consequently reduced foreign tax credit, this would occur at the price of both a U.S. tax on the capital gain from such sales and a loss of the income from the investments. In sum, we hold that the likelihood of avoidance of U.S. tax on the income from the farmlands operations is virtually nonexistent. Even if we were to find some element of U.S. tax avoidance because of possible gaps in the detailed application of our comparative tax analysis, we would be constrained to hold that such element was subsidiary to petitioner's other non-U.S.-tax avoidance motives so that petitioner's proposed transfer would not be within the ambit of section 367. [7] CF. Hershey Foods Corp. v. Commissioner,supra at 321. *134 Gain on the Disposition of the Farmlands
Petitioner proposes to transfer the farmlands to Mayland Farms, a Canadian corporation, in order to minimize Canadian tax upon her death, to facilitate the devise of the farmlands to her heirs, and to comply with Alberta provincial law concerning *135 foreign ownership of land. Petitioner is willing to enter into a closing agreement pursuant to which she would recognize the gain not recognized at the time of the transfer if Mayland Farms transfers the farmlands within ten years. Respondent argues that the facts belie petitioner's statement of purpose, and that potential tax avoidance exists in that a sale of the farmlands by Mayland Farms would avoid the U.S. tax that would be payable if petitioner were to sell the farmlands directly. Respondent does not appear to contest that, if petitioner were to die holding the farmlands, Canada would tax one half of the gain from the deemed transfer of the farmlands; that corporate ownership avoids this Canadian tax due to the step up in Canadian tax basis of the farmlands and of the corporate shares on the transfer to the corporation; that bequeathing shares of stock is practically less difficult than devising portions of the farmlands; or that Alberta provinical law forbids transfer of the farmlands to a U.S. corporation. The instant case is quite similar to Pitcher v. Commissioner,84 T.C. 85 (1985), a recent case in which the taxpayers exchanged their stock in a domestic *136 (U.S.) corporation for shares in a Canadian corporation, and thereafter effected a Canadian public offering for shares of the Canadian corporation. The taxpayers in Pitcher executed the transaction there in question in order to raise needed capital for the business while avoiding the SEC registration requirements and marketability restrictions that would necessarily have accompanied a domestic or Canadian public offering of stock in the domestic corporation. In Pitcher, we held that the potential avoidance of the tax on the appreciation in the shares of the domestic corporation, which was possible if the Canadian corporation were to sell its shares in the domestic corporation, was not in itself enough to justify respondent's unfavorable ruling, given the taxpayers' business purpose and willingness to enter into a closing agreement that would require them to recognize gain in the event of such a sale. 84 T.C. at 97-101. In the instant case, while it is true that there is a potential for U.S. tax avoidance if the proposed transfer occurs, we hold that such potential is not enough to render respondent's determination reasonable. To be sure, if petitioner were *137 to sell the farmlands while operating under the existing lease arrangements, the U.S. tax on the gain would be unreduced by foreign tax credits, as the sale would be exempt from Canadian tax under the Treaty. Thus, the proposed transfer to Mayland Farms would avoid this potential tax. However, petitioner's representation concerning her reversion to sharecropping irrespective of the execution of the transfer must again be given its due weight in light of the objective facts, discussed above, that (1) sharecropping is consistent with petitioner's historical preference, (2) petitioner is willing to enter into the closing agreement described supra, (3) there would be no Canadian tax incentive for petitioner to remain with leasing if there is no transfer, and (4) petitioner's total United States and Canadian tax is the same under sharecropping and leasing. Thus, even without the transfer, a sale by petitioner would be subject to Canadian tax, and such tax would reduce or eliminate the United States tax on such sale. Moreover, the record indicates that petitioner's intention is to pass the farmlands to her heirs, rather than selling them, and that Mayland Farms has no intention of *138 disposing of the farmlands. Cf. Pitcher v. Commissioner,supra at 88; Hershey Foods Corp. v. Commissioner,supra at 316. In any event, whatever potential for U.S. tax avoidance remains is not sufficient to justify respondent's determination that U.S. tax avoidance is, on the facts, one of petitioner's principal purposes. See Pitcher v. Commissioner,supra at 96-99. Finally, we cannot ignore, as respondent would have us do, petitioner's willingness to enter into a closing agreement which would have closed the door for ten years on any potential tax avoidance relating to the disposition of the farmlands by Mayland Farms. Respondent's position is consistent with the all-or-nothing approach to closing agreements that he has taken in the past, and is no less unreasonable herein than it has been found to be in previously decided cases. See, e.g., Pitcher v. Commissioner,supra at 100-101. Quite aside from respondent's unwillingness in the final analysis to enter into a closing agreement, he might at least have tested petitioner's intention by seeking to ascertain whether she would extend her offer *139 beyond the ten-year period, i.e., until her death, [8] and/or include the stock of Mayland Farms as well as the farmlands. Conclusion
As we view the instant case, respondent is essentially attempting to persuade us to elevate his suspicions into our convictions. This we are not prepared to do. While we may share respondent's suspicions to some *140 extent, we are unable to find that the administrative record herein discloses substantial evidence of a principal purpose of U.S. tax avoidance on the part of petitioner. Accordingly, we conclude that respondent's ruling is unreasonable within the meaning of section 7477(a)(2)(A), and that Mayland Farms will thus qualify for corporate status under section 367. An appropriate decision will be entered.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the relevant years, and all Rule references are to the Rules of Practice and Procedure of this Court.↩
2. One additional five-acre parcel of raw land, also located south of Calgary, was originally included in petitioner's ruling request but has been removed from the schedule of property to be transferred.↩
3. Actually, there would be a transfer tax to the extent of any appreciation in value of petitioner's stock between the time of the transfer to the corporation and the time of petitioner's death. Similarly, the corporation would receive a Canadian tax basis in the farmlands stepped up to fair market value and, upon disposition, would pay Canadian tax only on any subsequent appreciation in value. We note that the Canadian tax authority apparently would apply sec. 70(5) on the death of petitioner, taking the position that the deemed distribution is not a "sale or exchange" within the meaning of article VIII of the Treaty. See Estate of Ballard v. Commissioner,85 T.C. 300, 302↩ (1985).
4. For the years in issue, section 367 states, in relevant part: If, in connection with any exchange described in section 332, 351, 354, 355, 356, or 361, there is a transfer of property (other than stock or securities of a foreign corporation which is a party to the exchange or a party to the reorganization) by a United States person to a foreign corporation, for purposes of determining the extent to which gain shall be recognized on such transfer, a foreign corporation shall not be considered to be a corporation unless, pursuant to a request filed not later than the close of the 183d day after the beginning of such transfer (and filed in such form and manner as may be prescribed by regulations by the Secretary), it is established to the satisfaction of the Secretary that such exchange is not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes. We note that the Tax Reform Act of 1984, Pub. L. 98-369, 98 Stat. 494, significantly changed sec. 367 and repealed sec. 7477↩ with respect to transfers made after Dec. 31, 1984 or for which ruling requests are filed after Feb. 28, 1984. These amendments have no bearing on the transaction here in question.
5. This is true whether petitioner were to revert to sharecropping, in which case the maximum Canadian tax would be the 34-percent marginal rate, or to retain the leasing arrangement, in which case the Canadian rate would be limited by the Treaty to 15 percent.↩
6. The hypothetical defeat occurs in the situation in which petitioner does not revert to sharecropping if the transfer does not occur. In this situation, the Canadian tax rate on her investment income is no higher without the transfer than if the transfer were to take place, and the loss of the U.S. tax on the farmlands income is thus to outweighed by a higher post-transfer U.S. tax on petitioner's Canadian investment income.↩
7. In this connection, we find it unnecessary to decide how detailed a comparative analysis of the impact of U.S. and Canadian tax law on the future tax liabilities of petitioner should be made. We share respondent's concern that a requirement of such an analysis could be an undue burden on him, as well as the Court. On the other hand, we reject respondent's seeming rejection of any analysis whatsoever.Indeed, respondent's letter ruling and briefs contain considerable comparative tax analysis, to say nothing of the fact that respondent solicited such an analysis from petitioner prior to his determination. We go no further than to say that some comparative analysis is appropriate, and indeed essential, in determining whether the proscribed purpose existed. In the foregoing vein, we have found it unnecessary to delve into the intricate analysis involved in determining the impact of subpart F.↩
8. There is no explanation in the administrative record herein as to why petitioner's offer was limited to a 10-year period. We note that if the closing agreement were to extend until petitioner's death, the step-up in the U.S. tax basis, upon such death, of the shares in Mayland Farms, see sec. 1014, would result in a potential U.S. tax avoidance: Mayland Farms could distribute the farmlands to petitioner's estate in complete liquidation and the estate could then sell the farmlands without taxable gain to either Mayland Farms or the estate. Secs. 331, 336; United States v. Cumberland Public Service Co.,335 U.S. 451 (1950). However, this U.S. tax "avoidance," i.e., deferral, sanctioned by law, is without the scope of sec. 367. See Pitcher v. Commissioner,84 T.C. 85, 99-100↩ & n.29 (1985).